**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| | § | |
| ALLONHILL, LLC, | | Case No. 14-10663 (KG) |
| | § | |
| | § | |
| | § | |
| Debtor. | | |

~~SECOND~~THIRD AMENDED DISCLOSURE STATEMENT IN SUPPORT OF ~~SECOND~~THIRD AMENDED PLAN OF REORGANIZATION OF ALLONHILL, LLC

IMPORTANT: THIS ~~SECOND~~THIRD AMENDED DISCLOSURE STATEMENT ("DISCLOSURE STATEMENT") CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF REORGANIZATION DESCRIBED HEREIN. PLEASE READ THIS DOCUMENT WITH CARE.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT OR THE PLAN OF REORGANIZATION. ANY REPRESENTATION TO CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTOR BELIEVES THAT, UNDER THE CIRCUMSTANCES, THE PLAN PROVIDES THE BEST POSSIBLE RECOVERY TO ALL CREDITORS. THE DEBTOR BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF CREDITORS. THE DEBTOR RECOMMENDS THAT ALL CREDITORS ENTITLED TO VOTE ACCEPT THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT FOR CIRCULATION TO ALL CREDITORS AND INTEREST HOLDERS OR FOR THE USE IN SOLICITATION OF VOTES

# CONTENTS

**CLAUSE**

**PAGE**

ARTICLE I INTRODUCTION .................................................................. 4

    A.    Voting Instructions ............................................................... 6

        1.    Ballots .......................................................................... 6
        2.    Returning Ballots ........................................................ 6

    B.    Acceptance or Rejection of the Plan ..................................... 6

    C.    Brief Overview of Chapter 11 .............................................. 6

    D.    Overview of the Plan ........................................................... 8

ARTICLE II THE DEBTOR'S HISTORY AND REASONS FOR FILING CHAPTER 11 ................................................................................... 9

    A.    History of the Debtor ........................................................... 9

        ~~I~~1.    Corporate Structure and Business Operations .............. 9
        ~~II~~2.    Sale of Assets to Stewart Lenders Services, Inc., Resulting Investigations and Potential Causes of Action ........................................... 10
        ~~III~~3.    Prepetition Capital Structure ...................................... 12
        ~~A.~~    Assets ........................................................................ 12
        ~~B.~~(a)    Liabilities ................................................................ 13
        ~~C.~~(b)    Secured Debt .......................................................... 13
        ~~D.~~(c)    Unsecured Debt ...................................................... 13

    ~~IV~~B.    Circumstances Precipitating Chapter 11 Filing .................... 14

        ~~A~~1.    Stewart Post-Closing Challenges .............................. 14
        ~~B~~2.    Aurora Litigation ...................................................... 14

ARTICLE III SIGNIFICANT EVENTS DURING CHAPTER 11 CASE .................. 15

    A.    Employment of Professionals .............................................. 15

    B.    Post-petition Operations ....................................................... 16

        1.    Appeal of Aurora Judgment ...................................... 16
        2.    Retention of Professionals ......................................... 17
        3.    Executory Contracts .................................................. 17____ 17
        4.    Plan Preparation ........................................................ 17

5.     Management and Evaluation of Assets, Including Rights under SLS APA ...........................................................................................18

C.     Financial Statements/Reporting ........................................................................18

ARTICLE IV PLAN OF REORGANIZATION .........................................................................19

A.     General .................................................................................................................19

B.     Classification of Claims~~.~~.............................................................................................19

    1.     Administrative Claims ..............................................................................20
    2.     Priority Tax Claims ...................................................................................20

C.     The Plan ~~Provisions for~~ provides the following Treatment of Claims and Interests~~:~~.............................................................................................................21

    1.     Unclassified Claims .................................................................................21
        (a)     Administrative Claims ..................................................................21
        (b)     Priority Tax Claims ......................................................................21
    2.     Classes of Claims and Interests~~:~~...............................................................21
        (a)     Class 1: Other Priority Claims .....................................................21
        (b)     Class 2: Secured Claims ...............................................................22
        (c)     Class 3: General Unsecured Claims ..............................................22
        (d)     Class 4 - Old Class A LLC Interests ............................................23
        (e)     Class 5: - Old Class C Interests ...................................................23

D.     Means ~~For~~ for Execution of the Plan .................................................................25

    1.     Revesting of the Debtor's Property, including Causes of Action, into the Reorganized Debtor ....................................................................25
    2.     Analysis of Causes of Action ...................................................................26
    3.     Contributions by the Debtor's Members ..................................................26
    4.     Release of the SLS Escrow .......................................................................27

E.     Management of the Reorganized Debtor .............................................................27

~~F~~F.     Appointment of Disbursement Agent and Creation of Disbursement Account (the "Disbursement Procedures") .........................................................27

    1.     Withdrawal of Assets from the Disbursement Account ...........................28
    2.     The Disbursing Agent's Compensation, Indemnification, Expenses, etc.............................................................................................29
    3.     Resignation or Removal of the Disbursing Agent....................................29
    4.     Termination of the Disbursement Account ...............................................30
    5.     Dispute Resolution....................................................................................30
    6.     Disbursing Agent Authority to Accept Settlement or Other Resolution of Causes of Action ...............................................................31

G.     Effectuating Documents; Further Transactions ...................................................31

    1.     Exemption from Certain Transfer Taxes...................................................31
    2.     Corporate Action.......................................................................................32
    3.     Reorganized Debtor's Obligations under the Plan ...................................32

H.    Payment of Claims and Equity Interests ...................................................34

    1.    Payment of Administrative Expense and Professional Fee Claims..............——34

    2.    Description of Administrative Expense and Professional Fee
    Claims ........................................................................................35

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS, _PAYMENT OF
INTEREST AND DISTRIBUTIONS....................................... **Error! Bookmark not defined.**37

A.    Unexpired Leases and Executory Contracts ...........................................37

B.    Distributions for Allowed Claims .........................................................38

C.    Interest on Claims ..............................................................................38

D.    Designation; Distributions by Disbursing Agent .....................................38

E.    Means of Cash Payment ......................................................................38

F.    Fractional Distributions ......................................................................39

G.    *De Minimus* Distributions ...................................................................39

H.    Delivery of Distributions ....................................................................39

I.    Application of Distribution Record Date ................................................40

J.    Withholding, Payment and Reporting Requirements.................................40

K.    Setoffs..............................................................................................40

L.    Pre-Payment......................................................................................41

M.    No Distribution in Excess of Allowed Amounts......................................41

N.    Allocation of Distributions ..................................................................41

ARTICLE VI PLAN PROCEDURES FOR RESOLVING DISPUTED,
CONTINGENT, AND UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH
RESPECT THERETO...................................................................................41

A.    The Plan includes the following procedures for prosecution of Objections
    to and Estimation of Claims................................................................41

B.    The Plan provides the following treatment of Disputed Claims. ................42

    1.    No Distribution Pending Allowance ..........................................42

    2.    Distributions on Account of Disputed Claims Once They are
    Allowed................................................................................42

C.    Reserve Accounts ..............................................................................42

    1.    Administrative Claims Reserve ................................................43

    2.    Professional Fee Reserve ........................................................43

    3.    Disputed Claims Reserve ........................................................43

ARTICLE VII CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ........................................................................................45

    A.      Conditions to Occurrence of Confirmation ....................................................45

    B.      Conditions to Occurrence of Effective Date ...................................................45

    C.      Notice of Occurrence of Effective Date...........................................................46

    D.      Consequences of Non-Occurrence of Effective Date.......................................46

ARTICLE VIII RETENTION OF JURISDICTION ...................................................................46

ARTICLE IX MISCELLANEOUS PROVISIONS.....................................................................48

    A.      Administrative Claims ....................................................................................48

    B.      Professional Fee Claims...................................................................................49

    C.      Payment of Statutory Fees ..............................................................................49

    D.      Modifications and Amendments .....................................................................49

    E.      Continuing Exclusivity and Solicitation Period ..............................................50

    F.      Severability of Plan Provisions.......................................................................50

    G.      Successors and Assigns and Binding Effect ...................................................50

    H.      Compromises and Settlements.........................................................................52

    I.      Releases and Satisfaction of Subordination Rights.........................................52

    J.      THE PLAN PROVIDES BROAD RELEASES AND FOR THE DISCHARGE AND EXCULPATION OF VARIOUS PARTIES. ......................52

          1.      Releases of the Debtor, Debtor Principals, the Reorganized Debtor, and the Directors, Officers, Employees or Advisors of the Debtor...........52

          2.      Releases by Holders of Claims ...................................................54

    K.      Release of Liens..............................................................................................55

    L.      Discharge of Claims .......................................................................................56

    M.      Injunction .......................................................................................................56

    N.      Exculpation and Limitations of Liability under the Plan. ...............................57

    O.      Term of Injunctions or Stays...........................................................................58

    P.      Revocation, Withdrawal or Non-Consummation..............................................58

    Q.      Plan Supplement .............................................................................................58

    R.      Notices ...........................................................................................................58

    S.      Computation of Time.......................................................................................59

    T.      Governing Law ...............................................................................................59

    U.      Exhibits..........................................................................................................59

ARTICLE X VOTING ON AND CONFIRMATION OF THE PLAN ...................................... 60

    A.    Best Interest Test ............................................................................... 60

    B.    Financial Feasibility .......................................................................... 62

    C.    Classification of Claims and Equity Interests ................................... 62

    D.    Voting ................................................................................................ 62

        1.    Impaired Classes and Equity Security Interests ....................... 62
        2.    Classes That Are Not Impaired ................................................. 62
        3.    Classes That Are Impaired ....................................................... 62

    E.    Confirmation With Acceptance by All Impaired Classes ................... 63

    F.    Confirmation Without Acceptance by All Impaired Classes .............. 63

    G.    Alternatives to the Plan .................................................................... 64

    H.    Confirmation Hearing ........................................................................ 64

    I.    Voting Instructions ............................................................................ 65

ARTICLE XI MISCELLANEOUS DISCLOSURE ................................................................ 65

    A.    Material Litigation ............................................................................. 65

    B.    Certain Federal Income Tax ~~Ramifications~~Consequences ....................................... 66

        1.    Certain U.S. Federal Income Tax Consequences to the Holders of ~~Plan~~**Error! Bookmark not defined.**Claims against and Interests in the Debtor    67
        2.    Certain U.S. Federal Income Tax Consequences to the Debtor and Holders of Interests in the Debtor ....................................... 67
        3.    Information Reporting and Withholding ................................... 69
        4.    Certain U.S. Federal Income Tax Consequences to the Reorganized Debtor ............................................................... 69

    C.    Special Risk Factors ......................................................................... 70

ARTICLE XII CONCLUSION ................................................................................................ 7070

## PRELIMINARY STATEMENT

The following preliminary statement is qualified in its entirety by the more detailed information appearing elsewhere in this Disclosure Statement of the Debtor in Support of the Plan of Reorganization of Allonhill, LLC (the "~~Debtor") (the "~~Disclosure Statement") in support of the Plan of Reorganization (the "Plan"), as proposed by ~~the Debtor~~Allonhill, LLC (the "Debtor") in connection with the Debtor's solicitation of acceptances or rejections of the Plan, a copy of which accompanies this Disclosure Statement as "Exhibit A~~.~~".

All defined terms contained in this preliminary statement, as well as elsewhere in this Disclosure Statement, shall, unless otherwise defined herein, have the meanings ascribed to such defined terms in the Glossary attached to the Disclosure Statement as Exhibit "B".

The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") will hold a hearing on Confirmation of the Plan, at which time the Bankruptcy Court will consider objections to Confirmation, if any, commencing at 11 a.m. on ~~November 24~~December 17, 2015 in Courtroom No. 1, United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Sixth Floor, Wilmington, Delaware 19801 (the "Confirmation Hearing"). The Confirmation Hearing may be adjourned from time to time without notice other than the announcement of an adjourned date at the hearing. Objections to confirmation of the Plan must be in writing and served and filed as described below under Article X, Section H titled "Confirmation Hearing." The Order issued by the Bankruptcy Court scheduling a hearing on confirmation of the Plan should similarly be reviewed to best understand the confirmation procedures outlined briefly herein.

The Plan is a plan of reorganization. The Debtor sold substantially all of its assets (the "Stewart Transaction") to Stewart Lender Services, Inc. ("SLS") pursuant to an Asset Purchase Agreement between the Debtor and Stewart, dated August 28, 2013, and amended as of September 30, 2013 (the "SLS APA"). The Stewart Transaction is described in Article II of this Disclosure Statement.

The Debtor's operations currently consist of managing its rights under the SLS APA and winding down operations, including pursuing pending litigation to completion. Specifically, the Debtor is pursuing an appeal (the "~~Aurora ~~Appeal") in the Colorado Court of Appeals, of a substantial litigation award rendered by the Colorado District Court (the "Colorado Court") on March 5, 2014 against the Debtor and in favor of Aurora Commercial Corporation, f/k/a Aurora Bank FSB ("Aurora") in the amount of $25,845,329.00, plus prejudgment interest (together, the "Aurora Judgment"). The circumstances of the Aurora Judgment and ~~Aurora ~~Appeal are discussed in detail in Article IV.B. of this Disclosure Statement, entitled "Aurora Litigation".

In connection with the Aurora Litigation, the Debtor sought coverage under an insurance policy (the "XL Policy") issued by XL Specialty Insurance Company ("XL Specialty"). Following the Aurora Judgment, XL Specialty informed the Debtor that the Aurora Judgment triggered an exclusion under the XL Policy. Pending the outcome of the ~~Aurora ~~Appeal, XL Specialty has continued to make payments under the XL Policy under a reservation of rights to recoup all amounts paid. It has asserted a claim against the Debtor in the amount of $2,904,977.13 plus additional amounts. A decision in favor of the Debtor on the ~~Aurora ~~Appeal may have the effect of overturning or decreasing the Aurora Judgment, which in turn could affect

the availability of coverage under the XL Policy, and also materially affect the value of distributions available to Creditors holding Allowed Claims. The Debtor makes no prediction, however, as to the likelihood of this, or any, future events.

The Plan contemplates reorganization of the Debtor as the Reorganized Debtor, the cancellation of existing ~~Holders of~~ Old Class A Interests in the Debtor and reissuance of common interests by the Reorganized Debtor to the Holders of Old Class A Interests in the Debtor. Class C membership interests in the Debtor will be cancelled and the holders thereof are entitled under the Plan to payment of the value of their interests in *pro rata* proportion in accordance with the terms of the Debtor's Old Operating Agreement, subject to the priorities set forth in the Plan; more specifically, after satisfaction in full of the Claims of Creditors of all prior Classes and subject to and in accordance with the Debtor's Operating Agreement.

The Reorganized Debtor will be vested on the Plan Effective Date with all of the Debtor's rights and assets (including standing to pursue litigation (defined as "Causes of Action", and including "Litigation Rights" and "Avoidance Actions~~,~~", each as defined by the Plan)) and will pursue, for the benefit of Creditors, the liquidation of assets, collection of outstanding receivables and the Debtor's Causes of Action, including Litigation Rights and Avoidance Actions available under the Bankruptcy Code. As more fully described hereinafter, Causes of Action will be investigated and prosecuted by the Reorganized Debtor, as directed by the Estate Representative, with assistance and representation by its counsel, as approved by the Bankruptcy Court. Under the Plan, the Reorganized Debtor will distribute the proceeds of such rights and assets to Creditors holding Allowed Claims, to the extent of available funds and in accordance with the priorities established under the Bankruptcy Code.

The collection of the Debtor's Estate Assets, Causes of Action and Property as provided for under the Plan is intended to provide Creditors and Interest Holders with maximum distributions from the liquidation of the Estate Assets, Causes of Action and other Property of the Debtor.

On the Effective Date, the Plan appoints a Disbursing Agent to represent the interests of holders of Claims and Interests, and requires the creation of a Disbursement Account to hold all Estate Assets. The Disbursing Agent is required by the Plan to be a professional with relevant financial service and bankruptcy case management experience, and the initial Disbursing Agent will be Alfred T. ~~Giuliano~~Guilliano, CPA, CIRA, CFE, CBV, who has served in many bankruptcy cases in the District of Delaware as both chapter 7 and chapter 11 trustee, as well as in a financial advisory capacity to various constituencies. The signature of the Disbursing Agent, as well as of an appropriate officer of the Reorganized Debtor will be required for all withdrawals made from the Disbursing Account. The Disbursing Agent shall also have the ability to approve settlement offers made in respect of Causes of Action held by the Reorganized Debtor. In the case of a dispute between the Reorganized Debtor and the Disbursing Agent regarding a withdrawal or whether to accept a settlement offer, either party may seek an order of the Bankruptcy Court to resolve such dispute and direct action consistent with the Bankruptcy Court's decision. The Bankruptcy Court will retain exclusive jurisdiction under the Plan to hear and decide all matters arising under or in connection with the terms of the Plan relating to the Disbursement Account and the Disbursement Agent.

The collection of the Debtor's Estate Assets, Causes of Action and Property as provided for under the Plan is intended to provide Creditors and Interest Holders with maximum distributions from the liquidation of the Estate Assets, Causes of Action and other Property of the Debtor's Estate.

Detailed information regarding the treatment of each Class of Creditors and Holders of Equity Interests is set forth below under Article IV, titled "Plan of Reorganization."  The following chart shows the values of Claims and Interests in each Class as of the date hereof and the percentage Distribution to be made in respect of Claims and Interests in each such Class, as estimated by the Debtor based on the Debtor's current liquid assets.

**Estimated Distributions on Allowed Claims and Interests**

| **Class** | **Type of Claim** | **$ Value of Claims** | **% Distribution** |
|---|---|---|---|
| Unclassified | Administrative | $183,594.51 | 100% |
| Unclassified | Priority Tax | $105,981.48 | 100% |
| 1 | Other Priority | (none, currently) | |
| 2 | Secured | $4,281.19 | 100% |
| 3 | General Unsecured | $35,229,708.02 | 20% plus value of recoveries on Causes of Action |
| 4 | Old Class A Interests | $[_____] | Contingent upon value of recoveries from Causes of Action |
| 5 | Old Class C Interests | $[_____] | Contingent upon value of recoveries from Causes of Action |

THE DEBTOR BELIEVES THAT, UNDER THE CIRCUMSTANCES, THE PLAN PROVIDES THE BEST POSSIBLE RECOVERY TO ALL CREDITORS.  THE DEBTOR BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF CREDITORS.  THE DEBTOR RECOMMENDS THAT ALL CREDITORS ENTITLED TO VOTE ACCEPT THE PLAN.

The Debtor believes that, with respect to each Class of Claims, the Distributions under the Plan are greater than the amounts which would be received if the Debtor were to be liquidated under Chapter 7 of the Bankruptcy Code.

The Debtor seeks the acceptance or rejection of the Plan by all Creditors holding Allowed Claims in Classes 3, 4 and 5.  A Ballot to be used for voting to accept or reject the Plan has been enclosed with copies of this Disclosure Statement to all members of Classes 3, 4 and 5 and is attached hereto as Exhibit C.

After carefully reviewing this Disclosure Statement and the Plan, please indicate your vote on the enclosed Ballot and return to the address set forth below on or before October 26, 2015, in the envelope provided.

TO BE COUNTED YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS LISTED BELOW BY 4:00 P.M.  EST ON ~~November 13~~DECEMBER 8, 2015.

Allonhill Ballot Processing Center
c/o Upshot Services LLC
7808 Cherry Creek South Dr., Suite 112
-Denver, CO 80231

IF YOU HAVE ANY QUESTIONS WITH RESPECT TO FILLING OUT YOUR BALLOT, YOU MAY CONTACT ATTORNEYS FOR THE DEBTOR AT 212-918-3000 OR YOUR ATTORNEY.  THE FOREGOING IS A PRELIMINARY STATEMENT.  THIS DISCLOSURE STATEMENT AND THE EXHIBITS HERETO SHOULD BE READ IN THEIR ENTIRETY BY ALL CREDITORS BEFORE VOTING ON THE PLAN.

## ARTICLE I

## INTRODUCTION

The Plan is a reorganization plan under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), because under the Plan the Debtor is reorganized by the creation of a Reorganized Debtor, to be formed pursuant to the Reorganized Debtor's LLC Agreement (the execution of which is a condition of the effectiveness of the Plan).  The purpose of the Reorganized Debtor is, however, to liquidate all Estate Assets, including through the pursuit of Causes of Action.  Therefore, the Plan contemplates an orderly liquidation of the Estate Assets.

The information contained in this Disclosure Statement, together with any attached exhibits and appendices, concerning the financial condition of the Debtor or the events leading up to the bankruptcy, are based upon the Debtor's books and records, knowledge of members of management, a careful review of various contracts and documents, bankruptcy schedules, statements of financial affairs, and upon other financial information known by the Debtor and its professionals in this Chapter 11 case.  None of this information has been subjected to an audit by independent certified accountants or auditors.  The records maintained by the Debtor are dependent, in part, upon accounting performed by others.  While the Debtor has attempted to incorporate accurate information in this Disclosure Statement and in the Plan, the Debtor makes no representations or warranties concerning the accuracy of the information provided.

The Debtor hereby submits this Disclosure Statement with respect to the Plan, pursuant to §1125 of the Bankruptcy Code in connection with the solicitation of acceptances or rejections of the Plan from holders of Claims against and Equity Interests in the Debtor.  The purpose of this Disclosure Statement, including the exhibits attached hereto, is to provide adequate information to enable Creditors to make an informed judgment as to whether to vote to accept or reject the Plan.  THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT IS BASED

SOLELY UPON THE OPINIONS AND CONCLUSIONS OF THE DEBTOR AND ITS PROFESSIONALS.    VIRTUALLY ALL OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND EXHIBITS THERETO WEREWAS PRODUCED FROM THE DEBTOR'S BOOKS AND RECORDS AS MAINTAINED BY MANAGEMENT AND FROM AUDITED FINANCIAL STATEMENTS TO THE EXTENT AVAILABLE.

YOU SHOULD READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY BEFORE VOTING ON THE PLAN.    THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN ASPECTS OF THE PLAN, BUT THE PLAN ITSELF WILL BE THE GOVERNING DOCUMENT.    IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

Under the Bankruptcy Code, only the Classes of Claims that are "impaired," Classes 3, 4 and 5, as provided for in the Plan, may vote to accept or reject the Plan.  The Plan sets forth which of the Classes the Debtor believes constitute impaired Classes that arc entitled to vote under the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO MEMBERS OF CLASSES 3, 4 AND 5.

After carefully reviewing the Plan, this Disclosure Statement and the exhibits attached hereto, please indicate your vote with respect to the Plan on the enclosed Ballot and return it in the envelope provided.  PLEASE READ THE BALLOTING PACKAGE INSTRUCTIONS CAREFULLY AND VOTE EVERY BALLOT YOU RECEIVE.  IF YOU ARE ENTITLED TO VOTE IN MORE THAN ONE CLASS.  PLEASE BE CERTAIN TO DESIGNATE YOUR VOTE FOR EACH CLASS WHERE INDICATED ON THE BALLOTS.

NO REPRESENTATIONS CONCERNING EITHER THE DEBTOR OR THE PLAN ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND OTHER SOLICITATION MATERIALS, IF ANY, APPROVED BY THE BANKRUPTCY COURT.    ANY REPRESENTATION MADE TO SECURE THE VOTE OF THE HOLDER OF A CLAIM WHICH IS OTHER THAN AS CONTAINED HEREIN OR AS OTHERWISE APPROVED BY THE BANKRUPTCY COURT SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION CONCERNING THE PLAN.  ANY REPRESENTATIONS OR INDUCEMENTS MADE IN ORDER TO SECURE AN ACCEPTANCE TO THE PLAN THAT ARE NOT CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO THE OFFICE OF THE UNITED STATES TRUSTEE FOR APPROPRIATE ACTION.

For a summary description of the treatment of each Class of Claims and Equity Interests and the estimated value of Distributions to each Class of Claims and Equity Interests as provided in this Disclosure Statement, see Article IV, § B herein, titled "Classification of Claims and Equity Interests."

A.        Voting Instructions

A.1.    Ballots

In voting for or against the Plan, please use only the ballot sent to you with this Disclosure Statement.  IF YOU ARE VOTING IN MORE THAN ONE CLASS, YOU MAY DO SO ON THE ENCLOSED BALLOT.  YOU DO NOT NEED TO SUBMIT MORE THAN ONE BALLOT.

B.2.    Returning Ballots

IN ORDER TO BE COUNTED, BALLOTS MUST ACTUALLY BE RECEIVED BY THE BALLOTING AGENT, ALLONHILL BALLOT PROCESSING CENTER, C/O UPSHOT SERVICES LLC, 7808 CHERRY CREEK SOUTH DR., SUITE 112, DENVER, COLORADO 80231, ON OR BEFORE NOVEMBER 13DECEMBER 8, 2015 AT 4:00 PM (EST).  YOUR BALLOT WILL NOT BE COUNTED IF IT IS RECEIVED THEREAFTER.

B.        Acceptance or Rejection of the Plan

As a Creditor of the Debtor, your vote on the Plan is important. For the Plan to be accepted and confirmed by the Bankruptcy Court without resort to the "cramdown" provisions of the Bankruptcy Code, votes representing at least two-thirds in amount and more than one-half in number of Claims voted in each impaired Class must vote for acceptance of the Plan.

If any Class votes to reject the Plan, the Debtor will seek to satisfy the requirements for confirmation under the "cramdown" provisions of the Bankruptcy Code.  For a description of these requirements, see Article X, Section E and F, § E herein, titled "Confirmation Without Acceptance by All Impaired Classes."

C.        Brief Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Pursuant to Chapter 11, a debtor is authorized to reorganize its financial affairs for its own benefit and that of its creditors so as to effect an orderly liquidation of its assets and the distribution of the Cash proceeds therefrom to creditors.

The commencement of a Chapter 11 case creates an estate comprised of all the legal and equitable interests that a debtor has in property as of the date that the bankruptcy petition is filed. The Bankruptcy Code provides that a debtor may continue to manage its financial affairs and remain in possession of its property as a "debtor in possession" unless the Bankruptcy Court orders the appointment of a trustee.  The Debtor in this case has remained in possession of its property as debtor in possession.  No Trustee or Examiner has been appointed in this Chapter 11 case.

The filing of a Chapter 11 petition also triggers the "automatic stay" provisions of the Bankruptcy Code.  Section 362 of the Bankruptcy Code provides for a stay or an injunction against any attempt to collect a pre-petition debt, claim or obligation from a debtor or to

otherwise interfere with its property or business. Unless a bankruptcy court orders otherwise, the automatic stay remains in full force and effect until a plan is confirmed.

The formulation of a plan is the primary purpose of a Chapter 11 case. A plan sets forth the means by which a debtor will satisfy creditors who hold claims against a debtor. Although it is typically referred to as a plan of reorganization, it may also provide for the orderly liquidation or transfer of the debtor's assets.

After a plan is filed, the holders of claims against or equity interests in a debtor are requested to vote to accept or reject the plan. Before soliciting acceptances of a proposed plan, section 1125 of the Bankruptcy Code requires that a debtor prepare a disclosure statement which contains adequate information about a debtor, its assets and its liabilities that will enable a hypothetical, reasonable investor to make an informed decision to either accept or reject the plan.

Chapter 11 does not require that each holder of a claim against or an equity interest in a debtor vote in favor of a plan for a bankruptcy court to confirm a plan. The Bankruptcy Code defines acceptance of a plan by a given class of creditors holding claims against a debtor as acceptance by at least two-thirds in amount and more than one-half of the number of the holders of allowed claims in that class actually voting. The Bankruptcy Code also defines acceptance of a plan by a class of equity interests as acceptance by holders of two-thirds of the number of interests actually voting. Holders of claims or interests who fail to vote will not be counted as having either accepted or rejected the plan.

Classes of claims or equity interests that are not "impaired" under the plan are conclusively presumed to have accepted the plan and, therefore, arc not entitled to vote. Acceptances of the Plan in this Chapter 11 Case are being solicited only from those entities holding Claims in an impaired class.

Even if all classes of claims accept a plan of reorganization or liquidation, a bankruptcy court may determine that a plan should not be confirmed if the plan does not meet the requirements of § 1129(a) of the Bankruptcy Code. Generally, ~~Section~~section 1129(a) requires, among other things, that a plan be in the "best interest" of creditors and that it be "feasible" before being confirmed. The "best interest" test generally requires that the value of any consideration to be distributed to holders of claims under a plan may not be less than what such holders would receive if the assets of the debtor were liquidated pursuant to Chapter 7 of the Bankruptcy Code. The Debtor submits that, in ~~this case~~these Cases, the Plan satisfies the "best interest" test as a result of the orderly liquidation of the assets by the Reorganized Debtor, rather than by a Chapter 7 trustee, who will not have the same ability, working knowledge or expertise as the Reorganized Debtor and who will invariably add an additional layer of administrative expenses against the Estate.

There are several primary aspects of the Plan that make it preferable to Creditors than a Chapter 7 proceeding. The first aspect involves the vesting in the Reorganized Debtor of the Debtor's Causes of Action on the Effective Date. By assigning its Causes of Action (including both Litigation Rights and Avoidance Actions) to the Reorganized Debtor, the Plan ensures that control of Causes of Action by the Reorganized Debtor will maximize the recovery on the Causes of Action for the benefit of all Creditors and Interest Holders, while avoiding the costs that would be incurred if a chapter 7 trustee were to succeed to the Causes of Action. Moreover,

the Reorganized Debtor will have the benefit of the expertise, historical and industry knowledge and experience of the Debtor's manager, who will continue as manager of the Reorganized Debtor, and will do so without salary. Were a Chapter 7 trustee to bring these causes of action, the recovery on Causes of Action would be more cumbersome and expensive, and thus more remote because a Chapter 7 trustee would not have the historical knowledge possessed by Ms. Allon (a Holder of the majority of Old Class A Interests in the Debtor), who will be retained as the Reorganized Debtor's manager. In addition, the plan provides for a Contribution to be made to the Reorganized Debtor by Holders of Old Class A Interests in the Debtor in exchange for Releases and Exculpations to be granted by the Plan. This Contribution would not be available if the Debtor were liquidated under Chapter 7.

Additionally, section 1129(a) of the Bankruptcy Code requires that a plan be "feasible." The "feasibility" test requires a bankruptcy court to determine whether or not there is a reasonable probability that a debtor will be able to perform all obligations set forth in a plan. The Debtor submits that, in the instant case, the "feasibility" requirement does not apply because the Plan provides for the liquidation of the Estate's Assets and the reorganization of the Debtor to facilitate full realization of the value of all Causes of Action. The Plan does ensure, however, that the payments that are required to be made on the Effective Date and on Subsequent Distribution Dates will in fact be made in accordance with the priority scheme articulated in the Bankruptcy Code.

A bankruptcy court may confirm a plan of reorganization even though fewer than all of the classes of impaired claims accept it. For a plan to be confirmed *via* such a "cramdown" despite the rejection of one or more classes of impaired claims, a proponent of the plan must show, among other things, that the plan does not discriminate unfairly against a non-accepting class and that the plan is "fair and equitable" with respect to each non-accepting class. A plan is "fair and equitable" if it provides that, absent new value, a holder of any claim or interest that is junior to the claims of a non-accepting class will not receive or retain, on account of such junior claim or interest, any property unless all senior classes are paid in full.

D.    Overview of the Plan

THE DESCRIPTION OF THE PLAN SET FORTH BELOW IS A SUMMARY ONLY, AND IS QUALIFIED BY REFERENCE TO THE COMPLETE DOCUMENTS ATTACHED AS EXHIBITS HERETO. CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE PLAN ITSELF, WHICH IS INCLUDED AS EXHIBIT "A" TO THIS DISCLOSURE STATEMENT, AND THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN ARTICLE IV OF THIS DISCLOSURE STATEMENT, ENTITLED "PLAN OF REORGANIZATION."

The funds necessary for execution of the Plan shall be provided by the liquidation of the remaining assets of the Debtor, as further described *infra*, including the successful prosecution of any Causes of Action, which shall be preserved by the Plan and revested in and held, investigated and prosecuted by the Reorganized Debtor, by the release of the SLS Escrow and by the Contribution to be made and services to be rendered by the Debtor's Principals.

The Plan provides for the payment in full, in Cash, on the Effective Date, of all Allowed Administrative Expense Claims, Allowed Secured Claims and Allowed Priority Tax Claims, if any, which are not classified under the Bankruptcy Code, in the amounts ultimately determined by the Bankruptcy Court unless the holders of such Claims agree to a different treatment. Hearings on the Applications for Administrative Claims, to the extent not previously heard by the Bankruptcy Court, shall be heard at the Confirmation Hearing or shortly thereafter, as provided by the Plan.

The proposed Initial Distribution Date for Allowed General Unsecured Claims shall be the Effective Date or as soon thereafter as practical in accordance with the terms of the Plan or agreements negotiated with the holders of such Claims.

For a more complete discussion of the Plan and the mechanics for Distributions thereunder, see Article IV herein, titled "Plan of Reorganization."

## ARTICLE II

## THE DEBTOR'S HISTORY AND REASONS FOR FILING CHAPTER 11

~~ARTICLE I~~A.    History of the Debtor

~~II.~~1.   Corporate Structure and Business Operations

The Debtor is structured as a limited liability company whose membership interests consist of voting interests ("Class A Interests") and non-voting interests ("Class C Interests"). Management of the company is vested solely in the manager ("Manager"), Margaret Sue Allon ("Ms. Allon"), who has been manager since the Debtor was founded on June 12, 2008.  The Class A Interests are held by BHC Allonhill, LLC ("BHC"), a Delaware limited liability company, and Ms. Allon.  Ms. Allon's husband, Harvey B. Allon ("Mr. Allon") serves as the manager of BHC. The Class C Interests were issued as profit sharing interests to the Debtor's employees in bands for executive management and senior management with minor adjustments made based on capital contributions. The identity of the holder and the amount held (expressed as a percentage interest) of the Class A Interests and Class C Interests as of the Petition Date are:

Debtor's Membership Interests

| Member | Class | Percentage |
|--------|-------|------------|
| Margaret Sue Allon | Class A | 47.28054% |
| BHC Allonhill, LLC | Class A | 41.58420% |
| David Kaplan | Class C | 3.96134% |
| Diana Mead | Class C | 2.43198% |
| Daniel Gallery | Class C | 1.21599% |
| John Andriola | Class C | 1.21599% |

| Member | Class | Percentage |
|---|---|---|
| Michael Margolf | Class C | 0.27092% |
| Abram Spohn | Class C | 0.26147% |
| Lorie Helms | Class C | 0.25764% |
| Carey Willson | Class C | 0.25267% |
| Nicholas Lazzara | Class C | 0.24745% |
| Dawn Holdren | Class C | 0.10845% |
| Margaret Kronmueller | Class C | 0.10845% |
| Samuel Reid | Class C | 0.10267% |
| David Schiffmayer | Class C | 0.10122% |
| Eric Knab | Class C | 0.10001% |
| Kimberly Schiffbauer | Class C | 0.10001% |
| Brian Sherman | Class C | 0.10001% |
| Joseph Sueper | Class C | 0.10001% |
| John Wadle | Class C | 0.10001% |
| Elizabeth Watson | Class C | 0.0989% |
| | **TOTAL** | 100% |

Prior to December 31, 2013, the Debtor was a professional services firm based in Denver, Colorado, that previously provided loan due diligence and credit risk management services for institutions that invest in, sell, securitize or service mortgage loans. The Debtor's clients included a wide variety of financial service firms such as banks, investment banks, securitization trusts, institutional investors and government-sponsored entities. As of December 31, 2013, the Debtor ceased payroll and had and has no employees. The Debtor's administrative functions have been outsourced to Braddock Financial Corporation ("Braddock") pursuant to a Master Services Agreement dated September 1, 2013. Braddock is an investment adviser registered with the U.S. Securities and Exchange Commission that is controlled by Mr. Allon. Braddock and the Debtor share office space in Denver, Colorado. Currently, the Debtor's business consists of managing its remaining assets, as well as managing its rights and complying with its remaining obligations under the SLS APA (defined in Article II below).

III.2.  Sale of Assets to Stewart Lenders Services, Inc., Resulting Investigations and Potential Causes of Action

On August 28, 2013, the Debtor entered into a transaction (the "Stewart Transaction") to convey certain assets ("Target Assets") to Stewart Lender Services, Inc. ("Stewart"), pursuant

to an ~~Asset Purchase Agreement between~~ the ~~Debtor and Stewart, dated August 28, 2013, and amended as of September 30, 2013 (the "~~SLS APA"~~).~~. Stewart is a subsidiary of Houston-based Stewart Information Systems Corporation and a provider of mortgage servicing and origination support services. The SLS APA provides for the transfer to Stewart of certain assets, defined in the SLS APA as "Target Assets," and the assumption by Stewart of certain liabilities. The SLS APA excludes other assets and liabilities, in particular, liabilities relating to the Aurora Litigation discussed in Article III.B of this Disclosure Statement.

Stewart has certain indemnification rights against the Debtor for damages incurred by Stewart as a result of "Aurora Losses" as defined by the SLS APA. These rights are supported by the SLS Escrow. Because the granting by Aurora of the releases set forth in section 11.10 of the Plan effects a release of all claims that could result in Aurora Losses, the granting of such releases by Aurora and the entry of the Confirmation Order is deemed (and the Confirmation Order will so provide it to be) an "Aurora Resolution Event," " (as also defined in the SLS APA), upon which the Confirmation Order will direct that the funds held in the SLS Escrow shall be released by the Escrow Agent to the Debtor. Upon the Effective Date, such funds will revest in the Reorganized Debtor, subject to the Disbursement Procedures.

The consideration to be provided by Stewart under the SLS APA consisted of $15 million in cash paid on August 28, 2013, and a percentage of profits in excess of specified "hurdles" expected by the Debtor to be earned by Stewart over the next three succeeding years following the Closing Date (each such year being defined as either the "Year 1 Earnout Period", "Year 2 Earnout Period" and "Year 3 Earnout Period", as the case may be, and collectively, the "Earnout Period"), from Stewart's operation of the Target Assets (the "Business"). More specifically, the SLS APA provides that in addition to the payment of $15 million on the Closing Date, Stewart, as "Purchaser", is required to pay to the Debtor for each Earnout Period a percentage of eligible revenue achieved by Stewart's operation of the Business over certain hurdle amounts. For the Year 1 Earnout Period, this amount (the "Year 1 Hurdle Amount") was $17 million, and the percentage of revenue due to the Debtor was defined by the SLS APA as the amount of "Eligible Revenue" in excess of $17 million, multiplied by certain percentages defined in relation to strategic revenue and normal revenue for the Year 1 Earnout Period. The calculation required by the SLS APA to determine the Year 2 Earnout and the Year 3 Earnout are similar, except that the hurdle amounts are defined so as to increase if the preceding year revenue for the Business was greater than the initial $17 million Year 1 Hurdle Amount.

In November 2014, Stewart notified the Debtor that the Business had not achieved the Year 1 Hurdle Amount, and therefore, that no Year 1 Earnout was due to the Debtor. The Debtor is investigating, including by seeking discovery under Federal Rule of Bankruptcy Procedure 2004 ("Rule 2004"), the reasons why the Business, as operated by Stewart, was measured by Stewart to have failed to achieve the Year 1 Hurdle Amount. If the Debtor's investigation reveals that Stewart failed properly to operate the Business, or was negligent in its management of the Business, or breached terms of the SLS APA relating to the operation of the Business, the Debtor intends to pursue Causes of Action against Stewart for breach of contract ~~and/or,~~ negligence and/or other claims as appropriate. If the Debtor's investigation reveals that Stewart intentionally operated or managed the Business in bad faith, or in a manner that deprived the Debtor of consideration due under, or breached, the SLS APA, the Debtor (including as Reorganized Debtor) intends to pursue appropriate Causes of Action, including any Avoidance

Actions available under the Bankruptcy Code.  The Debtor's rights to the proceeds of any and all Causes of Action, including actions against Stewart, will be contributed to the Reorganized Debtor.

The Debtor also believes it has valid rights to recover certain transfers from Stewart. Beginning in January, 2014, the Debtor made certain transfers ("Pre-petition Transfers") to Stewart, totalling $6,608,309.15. Until the time of these transfers, Stewart was an unsecured creditor with a general contract claim against the Debtor in the amount of the Pre-petition Transfers.  The Debtor did not receive value from Stewart in exchange for the Pre-petition Transfers.  The Debtor has sought informally, and the Reorganized Debtor will continue post-confirmation through discovery under Rule 2004, to investigate these transfers, and if the Reorganized Debtor concludes that these transfers are recoverable under the Bankruptcy Code, the Reorganized Debtor will seek to avoid and to recover these amounts pursuant to sections 544, 547, 548 and 550 of the Bankruptcy Code, and will cause the Proceeds of any such recovery to be distributed in accordance with the terms of the Plan.

IV.3.   Prepetition Capital Structure

A.     (a)     Assets.  A balance sheet showing the Debtor's assets and liabilities as of the date hereof is attached as **Exhibit D** to this Disclosure Statement, and will be updated as of the date of the Confirmation Hearing.

Following the Stewart Transaction, the Debtor's most significant assets are:

1.(i)    its rights under the SLS APA, which, as noted above, may be the subject of litigation that is to be preserved, contributed to and vested in the Reorganized Debtor;

2.(ii)   rights to recover from Stewart under Section 550 of the Bankruptcy Code the value of transfers avoidable pursuant to Sections 544, 547 and 548 of the Bankruptcy Code which, as noted above, may be the subject of litigation, that is to be preserved, contributed to and vested in the Reorganized Debtor;

3.(iii)   its insurance rights under:

(i A)    the XL Policy, which is a Professional Liability (Run Off Tail endorsement), Policy No. ELU12904913, with a period of coverage from 8/30/13 until 8/30/16, with premium paid in full.

(ii B)    BriTech Technology/Brit Insurance, underwritten by Lloyds of London, brokered by Paragon International Insurance Brokers Ltd., Cyber Liability (Tail), Policy No. B0146CYUSA1300017, with a period of coverage from 2/28/14 to 2/28/17, with premium paid in full.

4.(C)    checking account held at Wells Fargo Bank, a money market account held at Wells Fargo Bank, deposits in such accounts having an aggregated total of $5,355,087.03 as listed on the Monthly Operating Report ("MOR") filed by the Debtor on August 20, 2015 for the month of July 2015

5.(D)    personal property in the form of computer and office equipment, with a value of $22,489.68;

6.(E)    SLS Escrow; and

7.(F)    contract rights against Aurora.

### (b)    Liabilities

The Debtor's liabilities consist of its obligations related to property leases, professional fees, trade debt, insurance, office equipment and software leases and, most significantly, a substantial litigation award in favor of Aurora Commercial Corporation, f/k/a Aurora Bank FSB ("Aurora") in the amount of $25,845,329.00, plus prejudgment interest, and a claim by XL Insurance Company for reimbursement of fees and expenses advanced by XL in connection with the Aurora Litigation.  The Aurora Litigation and the XL Claim are discussed in detail in Article IV.B. of this Disclosure Statement.

### C.(c)    Secured Debt

The Debtor has undisputed secured debt in the amount of $4,281.14 in the form of certain equipment and software leases.

### D.(d)    Unsecured Debt

E.The Debtor's scheduled, unsecured non-priority obligations total approximately $34,553,051.16, consisting of the judgment of $25,845,329 and pre-judgment interest awarded to Aurora, $3,130,469.97 claimed by XL for reimbursement of fees and expenses advanced in connection with the Aurora Litigation (as described in Article 11.B. hereof), and an additional amounts claimed by various trade creditors and governmental creditors.  Stewart has also filed a proof of claim asserting a right to recover $675,474.75 based on cash collections from customers of the business operated by Stewart with the contracts and assets that were the subject of the Stewart Transaction.

V.B.    Circumstances Precipitating Chapter 11 Filing

       A.1.    Stewart Post-Closing Challenges

Following the Stewart Transaction, the Debtor remained as a counterparty to numerous contracts and leases (the "Residual Contracts and Leases").  Absent novation of the Residual Contracts and Leases, the Debtor could have been exposed to significant liabilities under the Residual Contracts and Leases.  The Debtor's bankruptcy filing allowed it to manage its obligations under the Residual Contracts and Leases, in accordance with the Bankruptcy Code, so as to avoid defaults and potential damage to the Debtor's estate.  In addition, pursuant to the Plan, the Debtor rejects any contracts and leases as to which it remains obligated and has not specifically assumed during the bankruptcy case or under the Plan.

       B.2.    Aurora Litigation

In the fall of 2010, in response to various complaints, federal banking agencies conducted an examination of the fourteen largest mortgage loan servicers in the country, which included Aurora. That review found misconduct by all of the mortgage servicers, including Aurora, and each was compelled to enter into a consent order with their primary banking regulator requiring "independent reviews" of their foreclosure-related practices. On April 13, 2011, Aurora agreed to the issuance of Consent Order No.: NE-11-16 (the "Consent Order") by its then federal banking regulator, the Office of Thrift Supervision (OTS). The Office of the Comptroller of the Currency ("OCC") subsequently administered the Consent Order. Among other things, the Consent Order required Aurora to retain (subject to the approval of the OCC) an independent consultant to conduct an independent foreclosure review (the "IFR") of residential mortgage foreclosure proceedings that Aurora had initiated and conducted between January 1, 2009 and December 31, 2010.

After the Consent Order was issued, Aurora considered several candidates and ultimately selected the Debtor to conduct the IFR. On September 9, 2011, Aurora and the Debtor entered into an engagement letter agreement (the "Aurora Contract"). Pursuant to the Aurora Contract, the Debtor was to conduct the IFR required by the Consent Order. The Debtor performed the IFR until May 2012, at which time the OCC directed Aurora to terminate the Debtor, which Aurora did.

The Debtor subsequently filed a complaint against Aurora in the District Court for the City and County of Denver, seeking payment of more than $22 million in unpaid fees under the Aurora Contract as of the date of termination in the case styled *Allonhill, LLC v. Aurora Bank, FSB* (Case No. 12CV6381) (the "Aurora Litigation"). Aurora sought to be excused from its obligations on two grounds: (i) an alleged failure of Allonhill to perform and (ii) fraudulent inducement. Aurora also counterclaimed for the return of $24,000,000.00 previously paid to the Debtor under the Aurora Contract.  The Aurora Litigation was tried in December 2013. In March of 2014, the Court issued its Findings of Fact, Conclusions of Law and Order (the "Colorado Decision"), a true copy of which is attached hereto as Exhibit EB, hereto. In the Colorado Decision, the Colorado Court concluded that "there was no deliberate intent to defraud or deceive Aurora," *see* Colorado Decision, paragraph 175, and nonetheless, the Colorado Court found in favor of Aurora and against the Debtor on Aurora's breach of contract and fraud

counterclaims and awarded damages of $25,845,329.00 to Aurora, along with statutory prejudgment interest in the amount of $4,304,899.07 (as previously defined, (the "Aurora Judgment").

The Debtor has appealed the Aurora Judgment to the Colorado Court of Appeals on various grounds, including legal errors made by the trial court in applying Delaware law relating to fraud, rescission, and damages.  While it is impossible to predict the outcome of the appeal to the intermediate Colorado appellate court, that court could affirm the judgment in favor of Aurora, reverse the judgment and order judgment in favor of Allonhill on its claim for unpaid fees or reduce the damages awarded to Aurora. Aurora has responded to the Debtor's appealAppeal of the Aurora Judgment, and the appeal is fully briefed by both parties.  At this time, the parties await a decision of the Colorado appellate court.

In addition to the clear benefit of overturning the Aurora Judgment, the Debtor's liability insurance carrier, XL, has asserted its rights under the terms of its policy with the Debtor to recover $3.13 million for fees and expenses advanced in connection with the Aurora Litigation. Based on XL's assertion of its potential recovery rights as a result of the Aurora Judgment, XL has been listed as a creditor holding a contingent, disputed claim in the amount of $2,904,977.83 in the Debtor's schedules.  XL has also filed a proof of claim, alleging a right to recover costs and expenses advanced in connection with the Aurora Litigation and the appeal of the Aurora Judgment.  XL's right to recover its claim and the availability of the XL policy coverage depends in large part on the outcome of the appeal.  In addition, success on the appeal may significantly reduce or eliminate Aurora's claim, thus rendering the Estate solvent.

## ARTICLE III

## SIGNIFICANT EVENTS DURING CHAPTER 11 CASE

A.      Employment of Professionals

On March 24, 2014, the Debtor paid Hogan Lovells US LLP ("Hogan") a $250,000 retainer to initiate this Chapter 11Chapter11 proceeding.

On April 29, 2014, the Bankruptcy Court entered an Order granting the Debtor's application to retain Hogan as counsel, and Bayard, P.A., as local counsel Nunc Pro Tunc to March 26, 2014.  The Debtor also sought to retain professionals to provide legal and accounting services.  On April 29, 2014, the Bankruptcy Court authorized the retention of (1) Williams & Connelly LLP as special litigation counsel, (2) Haddon, Morgan & Foreman as special appellate counsel, and (3) EKS&H as tax accountant and auditor, in each case, *nunc pro tunc* to March 26, 2014.

On April 29, 2014, the Debtor retained each of the professionals referenced in the foregoing paragraph.

B.       Post-petition Operations

1.       Appeal of Aurora Judgment.

On April 7, 2014, the Debtor filed its Motion for Relief from the Stay to Permit Appeal to Proceed, for the purpose of gaining relief under section 362 of the Bankruptcy Code in order to perfect its appeal of the Aurora judgment. The Bankruptcy Court's Order Granting Relief from Stay to Permit Appeal to Proceed was entered on April 15, 2015.  The Debtor filed its Notice of Appeal on April 18, 2014, thus commencing the ~~Aurora Appeal~~appeal of the judgment held by Aurora.    At present, all briefing is completed in the Colorado Court of Appeals ("Court of Appeals"), and ~~the case is at issue awaiting the scheduling of oral argument.~~oral argument of the issues on appeal is scheduled before the Court of Appeals on November 18, 2015..

The Appeal has been a large focus of the Debtor's post-petition activities.  Several events required action by the Debtor in addition to briefing and litigating the substance of the Appeal. On July 11, 2014, the Court of Appeals issued an Order staying the Appeal and raising the issue of whether the judgment issued by the trial court was final, because that judgment did not include the amount of pre-judgment interest awarded.  On July 18, 2014, Aurora and the Debtor jointly moved the Court of Appeals to lift the stay imposed by its July 11 Order, on the grounds that the amount of pre-judgment interest was a matter of simple math and its calculation was a purely ministerial act.  By Order dated August 28, 2014, the Court of Appeals partially lifted its stay in order to permit the parties 35 days within which to seek from the Bankruptcy Court relief from the automatic stay imposed by the Bankruptcy Code and upon such relief, to resolve the matter of pre-judgment interest before the trial court.

On September 19, 2014, the Debtor submitted for approval by the Bankruptcy Court a stipulation between the Debtor and Aurora to modify the stay for the purpose of allowing Aurora to seek an award of pre-judgment interest so that the Appeal could move forward, and on September 22, 2014, the Bankruptcy Court entered its Order Further Modifying the Automatic Stay.  Based on Aurora's unopposed motion for an award of pre-judgment interest, on October 7, 2014, the Denver District Court entered an Order awarding pre-judgment interest.  A certified copy of the District Court's Order of October 7 was provided to the court of appeals by the Debtor and by its Order dated October 22, 2014, the Court of Appeals accepted the submission of the lower court's order and set a briefing schedule for the Appeal.

During the time when the Appeal was stayed by the Court of Appeals pending an award of prejudgment interest, it was discovered that the clerk of the District Court had inadvertently omitted from the record transmitted to the Court of Appeals all trial exhibits, depositions submitted and considered by the trial court and expert reports.  The Debtor's appellate counsel thus filed the Appellant's [Debtor's] Stipulated Motion to Supplement the Record on Appeal, on November 12, 2014, and the Court of Appeals granted the motion on December 26, 2015.  When the record was supplemented on January 26, 2015, the court of appeals issued a Notice of Filing of Supplemental Record, and extended the time for filing of the Debtor's opening brief on February 9, 2015.  The Debtor's appellate counsel thereafter moved on February 9, 2015 for a short extension of time – 8 days – to finalize Allonhill's opening brief and to assure proper citation to the voluminous materials included in the supplemental record.  The Debtor's opening brief was filed with the court of appeals on February 17, 2015.  Aurora sought one extension of

time beyond that allotted by Colorado rules in which to file its Answer Brief and filed its brief on April 21, 2015. The Debtor filed its Reply Brief on June 2, 2015.  Briefing of the appeal is now complete.

### B.2.    Retention of Professionals.

Pursuant to various Orders entered by the Bankruptcy Court authorizing the Debtor to retain counsel, on April 29, 2015 the Debtor retained the law firms of Hogan Lovells US LLP, as counsel to the Debtor and debtor in possession, Bayard P.A., as local Delaware counsel to the Debtor and debtor in possession, Williams & Connolly LLC, as litigation counsel to the Debtor and debtor in possession, and Haddon Morgan and Foreman, as appellate counsel to the Debtor. In addition, pursuant to the Bankruptcy Court's Order, also dated April 29, 2015, the Debtor retained the accounting firm, EKS&H, as tax accountant and auditor.

### C.3.    Executory Contracts.

The Debtor evaluated its remaining executory contracts to determine those which were to be assumed, assigned or rejected.  On June 10, 2014 the Debtor filed its Motion to Assume Lease or Executory Contract with Metropolitan Life Insurance Company. The Bankruptcy Court Order granting that Motion was entered on July 9, 2014.  On October 22, 2014, the Debtor filed its Motion to Extend Time Period Within Which the Debtor May Assume or Reject Unexpired Leases of Non-Residential Real Property.  Pursuant to the Order entered by the Bankruptcy Court on that motion, the Debtor assumed, and assigned to Stewart, a lease of office space located at 4700 S. Syracuse in Denver Colorado.

The Debtor has attempted to evaluate whether contracts that were to be assumed by Stewart pursuant to the terms of the SLS APA have, in fact, been assumed by Stewart.  The Debtor has determined that certain contracts may not have been effectively assumed by Stewart. In regards to those contracts, the Debtor has identified on Exhibit FA to this Disclosure Statement the contracts believed to remain executory, which should be assumed and assigned to Stewart.  The Debtor has also identified on Exhibit FA hereto contracts to which it remains a party and that are essential to the post-confirmation operations of the Reorganized Debtor, and which are to be assumed under the Plan and continued by the Reorganized Debtor.

The Debtor evaluated the SLS APA to determine whether that agreement is executory. Because the Debtor does not owe any material performance under the SLS APA, the Debtor has determined the SLS APA is not executory.

The Debtor's existing insurance policies are deemed to be executory, and therefore, will not be rejected under the Plan.

### D.4.    Plan Preparation.

On July 21, 2014, the Debtor was granted an extension until July 24, 2015 of the time period within which to file a plan pursuant to Bankruptcy Code section 1121(d).  On June 17, 2015, the Debtor filed a Motion to Further Extend the Exclusivity Period for Filing a Chapter 11 Plan and Disclosure Statement.  On July 2, 2015, Aurora filed its objection to this motion. By stipulation dated July 17, 2015, Aurora and the Debtor agreed that the time period within which

the Debtor may file a chapter 11 plan and solicit acceptances thereof would be extended by mutual agreement. On July 21, 2015, the Bankruptcy Court approved the parties' stipulation and entered its Order Further Extending the Period Within which the Debtor May File a Chapter 11 Plan and Solicit Acceptances Thereof. The Bankruptcy Court's July 21, 2015 Order extended the time allowed pursuant to Bankruptcy Code section 1121 within which the Debtor may file a chapter 11 plan to August 17, 2015, and extended the time within which the Debtor may solicit acceptances to such plan to October 5, 2015. The Debtor filed its initial proposed Plan of Reorganization on August 17, 2015, and filed its First Amended Plan of Reorganization on October 2, 2015., its Second Amended Plan on October 20, 2015 and will file its Third Amended Plan of Reorganization substantially simultaneously herewith. The time to solicit acceptances of the Plan (as amended) proposed by the Debtor was further extended to November 25, 2015. The Debtor is not precluded from seeking further extensions of these time periods, subject to the limitations of section 1121(d) of the Bankruptcy Code, nor does it limit rights or other parties to object to such requests.

     5.    :Management and Evaluation of Assets, Including Rights under SLS APA

Subsequent to the petition date, the Debtor also evaluated the Estate assets, which largely consist of its contract rights against Stewart. The Debtor also evaluated Avoidance Actions against Stewart, as well as against other parties and interest holders.

In November, 2014, the Debtor was informed by Stewart that no Earnout was owed under the SLS APA for the First Year Earnout Period. The Debtor negotiated and entered into the Agreement to Bankruptcy Court Jurisdiction, dated February 12, 2015, by and between the Debtor and Stewart (the "SLS Jurisdiction Agreement"), that allows and requires both parties to bring claims related to the Earnout due under the SLS APA, as well as related to Stewart'sStewart's Proof of Claim and claims that the Debtor may have against Stewart, in the bankruptcy case. The SLS Jurisdiction Agreement was approved by the Bankruptcy Court on March 26, 2015. During the period from December, 2014 through June, 2015 the Debtor and Stewart negotiated an attempted consensual exchange of information relating to the Earnout and potential avoidance actions.

Pursuant to the Plan, the Debtor will transfer all Causes of Action (including all Avoidance Actions, Litigation Rights and potential claims against Stewart still under investigation) to the Reorganized Debtor, and the Causes of Action will be vested in the Reorganized Debtor, along with the standing, right and authority to hold, to investigate and to prosecute the Causes of Action and any other potential claims.

C.    Financial Statements/Reporting

During the Chapter 11 CaseCases, the Debtor has complied with the reporting requirements imposed by the Bankruptcy Code and by the Office of the United States Trustee, including the filing of schedules, statements of financial affairs, and monthly operating reports. These schedules, statements and reports are available for inspection at the Clerk or the Bankruptcy Court.

## ARTICLE IV

## PLAN OF REORGANIZATION

The Debtor submits that, under the Plan, holders of Allowed Claims against the Debtor will obtain recoveries from the Debtor's estate having a value in excess of what otherwise would be available if the Estate's assets were liquidated pursuant to Chapter 7 of the Bankruptcy Code.

THE FOLLOWING IS A SUMMARY OF THE MATTERS CONTEMPLATED TO OCCUR EITHER PURSUANT TO OR IN CONNECTION WITH CONSUMMATION OF THE PLAN. THIS SUMMARY HIGHLIGHTS THE SUBSTANTIVE PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OF THE PLAN. STATEMENTS REGARDING ESTIMATED AMOUNTS OF CLAIMS OR PROJECTED DISTRIBUTIONS (OR THE VALUE OF SUCH) ARE ESTIMATES BY THE DEBTOR BASED ON CURRENT INFORMATION.

A.    General

On the Effective Date, all of the Debtor's Assets shall be transferred to and ~~will become~~be vested in the Reorganized Debtor. All Claims against the Debtor will be satisfied as set forth in the Plan.

The Plan appoints the Reorganized Debtor as Estate Representative for the purpose of standing to pursue and assert the Causes of Action. The Reorganized Debtor will be empowered and authorized, and will undertake post-confirmation, to investigate, prosecute, pursue, including through compromise or settlement, as deemed by the Reorganized Debtor to be in the best interests of Creditors, and conclude the Causes of Action, which will be preserved for the benefit of Creditors under the Plan.

The Reorganized Debtor's Manager will be Ms. Allon. Ms. Allon will not be paid a salary by the Reorganized Debtor. Her services as manager are expected significantly to contribute to and to enhance the Reorganized Debtor's ability to pursue Causes of Action post-confirmation and are promised in consideration of the Releases and injunctions to be granted by the Plan. Given Ms. Allon's knowledge of the Debtor's operations, business and transactions, as well as the industry in which the Debtor and its transaction counterparties (including Stewart) operate, retention of Ms. Allon's services as Manager of the Debtor is believed to be key to the Reorganized Debtor's success in pursuing the Causes of Action.

B.    Classification of Claims~~.~~.

A Chapter 11 plan may specify that certain classes of claims or interests are unimpaired by the reorganization or liquidation effectuated by the plan. A class is deemed unimpaired if, among other things, the plan does not alter the legal, equitable, or contractual rights of the members of such class, or the holders of claims are to be paid in full in Cash with respect to the allowed amount of their claims upon the effective date of the plan (or thereafter with interest). Such classes are referred to as "unimpaired" and, because of such treatment, are deemed to accept the plan. Accordingly, the Bankruptcy Code does not require a plan proponent to solicit votes from holders of "unimpaired" claims. In addition, the holders of Class 4 Claims, because

they are insiders of the Debtor, are not entitled to vote to accept or reject the Plan. Class 4 Claims are deemed to accept the Plan, and such acceptance shall not be counted for purposes of determining an impaired, accepting class required for confirmation of the Plan.

~~1.~~ In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims and Priority Tax Claims have not been classified by the Plan, and the respective treatment of such unclassified Claims is set forth in section 3.01 the Plan as follows:

### 1.    ~~(a)~~ Administrative Claims

Except to the extent that an Allowed Administrative Claim has been paid prior to the Initial Distribution Date, except as otherwise provided with respect to Professional Fee Claims, or unless otherwise agreed to by the Debtor and the Holder of an Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall be entitled to receive in full and complete settlement, release, and discharge of such Claim, payment in full in Cash of the unpaid portion of an Allowed Administrative Claim on the Distribution Date.

### 2.    ~~(b).~~ Priority Tax Claims

Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Initial Distribution Date or unless otherwise agreed to by the Debtor and the Holder of an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall be entitled to receive in full and complete settlement, release, and discharge of such Claim, payment in Cash of the unpaid portion of an Allowed Priority Tax Claim on the Distribution Date.

~~2.~~ Article II of the Plan classifies the various Claims and Equity Interests in the Debtor in the Classes, as set forth below.

~~(a)~~1.    Unclassified Claims, which are not entitled to vote on the Plan, as described in the next preceding paragraphs.

~~(b)~~2.    Priority and Secured Claims, which are Unimpaired and not entitled to vote on the Plan.

The Plan creates the following Classes of Claims and Interests:

Class 1.  Other Priority Claims

Class 2.  Secured Claims

~~3.~~ Article II of the Plan identifies the following Impaired Classes of Claims that are entitled to vote on the Plan

Class 3.  General Unsecured Claims

Class 4 – Old Class A Interests (as "insiders", this class is deemed to accept 1 )/)

Class 5 - Old Class C Interests

C.     The ~~Plan's Provisions for~~ Plan provides the following Treatment of Claims and Interests ~~:~~:

~~1)~~ 1.     Unclassified Claims ~~:(a)~~        :

~~A.~~ (a)   Administrative Claims

Except to the extent that an Allowed Administrative Claim has been paid prior to the Initial Distribution Date, and except as otherwise provided for herein (including Section 11.02 with respect to Professional Fee Claims) or unless otherwise agreed to by the Debtor and the Holder of an Allowed Administrative Claim, each Holder of an Allowed Administrative Claim shall be entitled to receive in full and complete settlement, release, and discharge of such Claim, payment in full in Cash of the unpaid portion of an Allowed Administrative Claim on the Distribution Date.

(b)        ~~(b)~~ Priority Tax Claims

Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Initial Distribution Date or unless otherwise agreed to by the Debtor and the Holder of an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall be entitled to receive in full and complete settlement, release, and discharge of such Claim, payment in Cash of the unpaid portion of an Allowed Priority Tax Claim on the Distribution Date.

~~2)~~ 2.     Classes of Claims and Interests:

(a)     Class 1: Other Priority Claims

Classification:  Class 1 consists of Other Priority Claims against the Debtor.

Treatment:  The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims will be unaltered by the Plan.  Unless otherwise agreed to by the Holders of the Allowed Class 1 Claims and the Debtor, each Holder of an Allowed Class 1 Claim shall receive in full, final and complete satisfaction, settlement, release, and discharge of such Allowed Class 1 Claim, payment of the Allowed Class 1 Claim in full in Cash on the Distribution Date.

Voting:  Class 1 is Unimpaired, and the Holders of Class 1 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan.

---

1/      Because Class 4 consists of parties that are "insiders" of the Debtor.  Thus, Class 4 will be deemed to accept the Plan.  Old Class 5 consists of holders of Old Class C (equity) Interests in the Debtor, and is comprised of former employees whose interests were issued as compensation.

(b)    Class 2: Secured Claims

Classification:  Class 2 consists of Secured Claims against the Debtor.

Treatment:  Each holder of an Allowed Class 2 Secured Claim shall receive, in the sole discretion of the Debtor or the Reorganized Debtor, one of the four following forms of treatment:

(a~~i~~)    an amount equal to the unpaid amount of such Allowed Claim in Cash commencing on the later of (i) the Effective Date, (ii) the date that is ten (10) Business Days after such Claim becomes an Allowed Class 2 Claim by a Final Order; or

(b~~ii~~)    the Debtor shall abandon the Property that secures the Allowed Class 2 Claim to the Holder of such Claim on or as soon as practicable after the later of (~~i~~x) the Effective Date and (~~ii~~y) the date that is ten (10) Business Days after the date on which such Claim becomes an Allowed Class 2 Claim by a Final Order; or

(c~~iii~~)    such other as the Holder and the Debtor or the Reorganized Debtor shall have agreed upon in writing; or

(~~d~~) (iv) (x)    such holder shall retain its Lien securing its Allowed Class 2 Secured Claim to the extent of the Allowed Amount of its Secured Claim; and (~~ii~~y) on or as soon as practicable after the later of (~~i~~i) the Effective Date and (~~ii~~ii) the date that is ten (10) Business Days after such Claim becomes an Allowed Secured Claim by a Final Order:

(A)  the Reorganized Debtor will cure any default other than a default of the kind specified in section 365(b)(2) of the Bankruptcy Code;

(B)  the maturity of such Claim shall be Reinstated as the maturity existed before any default;

(C)  the Holder of such Claim shall be compensated for any damages which occurred as the result of any reasonable reliance by the Holder on any provision that entitled the Holder to accelerate the maturing of such Claim; and

(D)  the other legal, equitable and contractual rights to which such Claim entitles the Holder shall not otherwise be altered.

Voting:  Class 2 is Unimpaired, and the Holders of Class 2 Claims will be conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 2 Claims will not be entitled to vote to accept or reject the Plan.

(c)    Class 3: General Unsecured Claims

Classification:  Class 3 consists of General Unsecured Claims against the Debtor.

Treatment:  Each Holder of an Allowed Class 3 Claim shall be paid a *pro rata* percentage of the Allowed amount of its Class 3 Claim, in Cash (i) on the Initial Distribution Date, from the

Debtor's available assets, less (y) the Reserves set forth in Section 8.03 of the Plan, and (z) the amount of Cash on hand the Debtor is authorized to retain on the Effective Date, and (ii) on Subsequent Distribution Dates from the Debtor's available assets, less the Reserves set forth in Section 8.03 of the Plan, in full, final and complete satisfaction, settlement, release, and discharge of such Allowed Class 3 Claim.  In the event that Excess Cash exists in sufficient amount to pay 100% of the Allowed amount of Class 3 Claims, each Holder thereof shall be paid simple interest on the Allowed amount of its Class 3 Claim at the post-judgment interest rate provided for in 28 U.S.C. § 1961 (on the Petition Date) on the unpaid principal amount of such Allowed Claim from the Petition Date to and including the Effective Date.

Voting:  Class 3 is Impaired, and the Holder of Class 3 Interests will be entitled to vote to accept or reject the Plan.

(d)    Class 4 - Old Class A LLC Interests

Classification:  Class 4 consists of the Old Class A LLC Interests in the Debtor held by Holders of Old Class A Interests of the Debtor as of the Petition Date.

Treatment:  The Holders of the Allowed Class 4 Interests shall receive 100% of the New Common LLC Interests in the Reorganized Debtor.

Voting:  Class 4 is Impaired, and the Holders of Class 4 Interests are insiders, and therefore Class 4 is deemed to accept the Plan.  The votes of Holders of Class 4 Interests will be solicited for the purposes of determining their consent to or rejection of the release, injunction and exculpation provisions set forth in sections 11.10 through 11.14 of the Plan. Although Class 4 is deemed to accept the Plan, such acceptance shall not constitute acceptance by an impaired class for purposes of section 1129 of the Bankruptcy Code.

(e)    Class 5: - Old Class C Interests

Classification:  Class 5 consists of the Old Class C Interests in the Debtor held by certain of the Debtor's former employees as of the Petition Date.

Treatment:  The HoldersEach Holder of thean Allowed Class 5 Interests shall receive a pro rata percentage of the Allowed amount of its Class 5 Interest, in accordance with the terms of the Debtor's Operating Agreement as if the Old Class C Interests were not cancelled by this Plan, subject to the prior payment in full of Claims in Classes 1 through 3, in Cash (i) on the Initial Distribution Date, from the Debtor's available assets, less (y) the Reserves set forth in Section 8.03 of the Plan, and (z) the amount of Cash on hand the Debtor is authorized to retain on the Effective Date, and (ii) on Subsequent Distribution Dates from the Debtor's available assets, less (y) the Reserves set forth in Section 8.03 of the Plan, in full, final and complete satisfaction, settlement, release, and discharge of such Allowed Class 5 Interest.

Voting:  Class 5 is Impaired, and is entitled to vote to accept or reject the Plan.

For avoidance of doubt, the Holders of Interests in Class 4 and Class 5 will retain against the Reorganized Debtor their rights under the Debtor's Operating Agreement to payment of their Interests, subject to prior payment in full of Allowed Claims of Classes 1, 2 and 3. The Holders

of Class 5 Interests will be entitled to payment of their Interests only in the event that the Reorganized Debtor is able to pay all Claims of Classes 1, 2 and 3 in accordance with the treatment afforded to those Classes under the Plan, and in the event such Claims of these prior Classes are paid in full, then the Holder of Class 5 Interests will be entitled to payment of their Interests in accordance with the terms of the Debtor's Operating Agreement as if the Interests of Holders of Old Class C Interests are not cancelled by the Plan.

D.      Means for Execution of the Plan

The Plan contemplates the liquidation of all of the Estate Assets by the Reorganized Debtor for the benefit of, and on behalf of the Creditors and Interest Holders.  The Plan provides that Causes of Action shall be preserved and vested in the Reorganized Debtor.  The Plan appoints the Reorganized Debtor as Estate Representative for the purposes of assuming the Debtor's standing with respect to all Causes of Action, whether held by the Estate or as debtor in possession, and investigating and prosecuting Causes of Action in accordance with the Plan, for the benefit of the Debtor's Creditors and Interest Holders with Allowed Claims.

Except as might otherwise be provided by the Plan, on the Effective Date, title in and to all Estate Assets, Cash, Proceeds of Causes of Action and Property of the Debtor shall be transferred to and vest in the Reorganized Debtor, subject to the Disbursement Procedures, for the purpose of effectuating the Distributions provided for under the Plan free and clear of all Claims and Equity Interests pursuant to 1141(b) and (c) of the Bankruptcy Code.  Pursuant to sections 5.16 through 5.22 of the PlanDisbursement Procedures, the Reorganized Debtor shall transfer all Estate Assets, Cash, Proceeds of Causes of Action and Property to the Disbursement Account, and disbursements shall be made by the Disbursing Agent.  All Claims against the Debtor, or the Estate Assets, shall also be transferred to the Reorganized Debtor subject to the provisions of the Plan.

1.      1.      Revesting of the Debtor's Property, including Causes of Action, into the Reorganized Debtor.

On the Effective Date, except as might otherwise be provided in the Plan, or in the Confirmation Order, and pursuant to section 1123(b)(3) and section 1141(b) and (c) of the Bankruptcy Code, all of the property and assets of the Debtor and all Causes of Action, Litigation Rights and Avoidance Actions, including the Aurora Litigation and the SLS Claims, shall automatically revest in the Reorganized Debtor, free and clear of all Claims, Liens and Interests. The Reorganized Debtor shall be the Estate Representative. The Reorganized Debtor (in accordance with the terms of the Plan relating to the Disbursement Account and Disbursing Agent) shall make all Distributions under the Plan.  Thereafter, the Reorganized Debtor may operate its business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court.  As of the Effective Date, all such property of the Reorganized Debtor shall be free and clear of all Claims, Liens and Interests, except as specifically provided in the Plan or the Confirmation Order and the Reorganized Debtor shall receive the benefit of any and all discharges under the Plan.

-Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code and to the fullest extent possible under applicable law, on the Effective Date, the Reorganized Debtor shall retain and may enforce, and shall have the sole right to enforce or prosecute, any claims, demands, rights, and Causes of Action that the Debtor may hold against any Entity, including, without limitation, all Litigation Rights, Avoidance Actions, the Aurora Litigation and the SLS Claims.  The Reorganized Debtor or its successor may pursue such retained claims, demands, rights or Causes of Action, Litigation Rights or Avoidance Actions, including, without limitation, the Aurora Litigation or the SLS Claims, as

appropriate, in accordance with the best interests of the Reorganized Debtor or its successor holding such claims, demands, rights, Causes of Action, Avoidance Actions or Litigation Rights.

2.        2.        Analysis of Causes of Action.

The Debtor contends that it has valid Claims exist against Stewart, which must be pursued by the Reorganized Debtor on behalf of the Creditors and Interest Holders. These are described in Article II of this Disclosure Statement. These and other Causes of Action are preserved by the Plan and shall be revested in the Reorganized Debtor upon the Effective Date.

In addition, the Debtor continues, through the Aurora Appeal, to seek to recover on its complaint against Aurora, which was originally filed in the Colorado Court and which seeks payment of more than $22 million in unpaid fees under the Aurora Contract. The Debtor's rights to pursue the Aurora Appeal, and subsequent appeals, to a final, non-appealable judgment, shall revest in the Reorganized Debtor on the Effective Date.

As described in Article IV, section B, paragraph 3 above, the Plan preserves and automatically revests in the Reorganized Debtor all Causes of Action including, without limitation, all Litigation Rights, Avoidance Actions, the Aurora Litigation and the SLS Claims.

3.        3.        Contributions by the Debtor's Members.  Certain members of the Debtor.

The Debtor's Principals, *i.e.,* Ms. Allon and BHC Allonhill LLC (as funded by Mr. Allon), and Mr. Allon will contribute $150,000 to the Reorganized Debtor, to be deposited in and held in the Disbursement Account (described *infra.*) upon the granting of sufficient Releases, Injunctions and Exculpations by the Plan. The Debtor has evaluated potential Causes of Action against these contributors, who are the Debtor's Principals, and believes that neither the Debtor nor the Estate has valuable Causes of Action against these parties. Notwithstanding the Debtor's analysis of potential Causes of Action held by the Debtor and/or the Estate, the granting of releases to and exculpation of the Debtor's Principals is conditioned on the conclusion of an Investigation Period of 120 days after confirmation of the Plan, during which an independent third party to be appointed by the Bankruptcy Court will investigate and evaluate potential causes of action against the Debtor's Principals. In addition, the Debtor, as debtor in possession, has evaluated based on the all facts known to the Debtor, whether any third party actions against the Debtor's Principals that would be released under the Plan if all voters choose to opt in favor of the Plan's release, injunction and exculpation provisions have considerable value. Based on the analysis performed by the Debtor, acting as debtor in possession, the Debtor believes that the value of Contribution exceeds the value to the Debtor's Principals of the releases, exculpations and injunctions to be granted by the Plan. The Contribution will be made upon conclusion of the Investigation Period, if the Releases and Exculpations to be granted by the Plan are determined by the Allons and BHC Allonhill LLC to be sufficient.

In addition, Ms. Allon will continue to serve as manager of the Reorganized Debtor, without salary. This Contribution contribution, and Ms. Allon's commitment to perform future services as Manager, will be made in consideration of the releases and injunctions to be granted to Ms. Allon, Mr. Allon and BHC Allonhill LLC under the Plan.

4.    4.    Release of the SLS Escrow.

The SLS Escrow was created pursuant to the SLS APA and related agreements between Stewart and the Debtor.  The APA and these related agreements provide for the release of the SLS Escrow upon the occurrence of an Aurora Resolution Event (as defined in the SLS APA). The Plan provides that confirmation of the Plan including the releases by Holders of Allowed Claims and Interests (and in particular, of Stewart by Aurora, should Aurora opt to grant the releases provided in section 11.10 of the Plan), and the entry of the Confirmation Order shall be deemed (and the Confirmation Order shall so provide) to be an Aurora Resolution Event.  The Confirmation Order shall further direct that if Aurora opts to grant the releases provided in section 11.10 of the Plan, the Escrow Agent toshall deliver the funds held in the SLS Escrow to the Debtor, and for the revesting of suchthose funds shall revest in the Reorganized Debtor.

E.    Management of the Reorganized Debtor

On, as of, or after the Effective Date, the Reorganized Debtor may enter into such transactions and may take such actions as may be necessary or appropriate, in accordance with any applicable state law, to effect a corporate or operational restructuring of its business, to otherwise simplify the overall corporate or operational structure of the Reorganized Debtor, to achieve corporate or operational efficiencies, or to otherwise to improve financial results; provided that such transactions or actions are not otherwise inconsistent with the Plan, the Distributions to be made under and pursuant to the Plan and/or the New Governance Documents.

F.    1.    Appointment of Disbursement Agent and Creation of Disbursement Account (the "Disbursement Procedures").

The Plan appoints the Disbursing Agent as representative of the Holders of Allowed Claims and Interests thereunder for the purposes set forth in the Disbursing Procedures.  The Disbursing Agent's appointment shall be effective until all Allowed Claims in Class 3 are paid in full, and thereafter shall be terminated. The Reorganized Debtor shall establish with the Disbursing Agent, a segregated interest bearing account (the "Disbursement Account") to be held for the benefit of the Holders of Allowed Claims and Interests pursuant to and in accordance with the Plan.  The contents of the Disbursement Account shall consist of all assets of the Estate, including all proceeds of any Cause of Action, and shall be subject to withdrawal solely as provided herein. On the Effective Date, to fund the Disbursement Account as required by the Plan, the Reorganized Debtor shall transfer to the Disbursing Agent, for deposit to the Disbursement Account, all Estate Assets.  From time to time, and not more than 20 business days after the realization by the Reorganized Debtor of proceeds of any Cause of Action, the Reorganized Debtor shall transfer such proceeds to the Disbursing Agent, for deposit to the Disbursement Account.  The failure of the Reorganized Debtor to so deliver proceeds as required hereunder shall be a default under the Plan and the amount of undelivered proceeds shall be recoverable from any responsible party notwithstanding the releases, exculpations and injunctions granted under the Plan.

Alfred T. GuilianoGuiliano, CPA, CIRA, CFE, CBV shall be appointed to serve as the Disbursement Agent as of the Effective Date. Mr. Giuliano'sGuiliano's term shall continue until his resignation or removal as provided in the Plan. The Disbursing Agent is authorized and shall

have the power to receive the Assets from the Reorganized Debtor and to hold, invest, reinvest and dispose of the same for the uses and purposes of and according to the provisions herein set forth.  All Assets shall be maintained by the Disbursing Agent in the Disbursement Account separate and distinct from all other assets on the books of the Disbursing Agent and shall be continuously kept in a safe place at the Disbursing Agent's office or at the office of the Disbursing Agent's intermediary, bank or financial institution in the United States.

The Disbursing Agent will provide or make available electronically an activity report (the "Disbursing Agent Activity Report") to the U.S. Trustee and all Parties in Interest upon creation of the Disbursement Account and within ten (10) Business Days following each calendar month showing, in reasonable detail, (1) all deposits and withdrawals effected during such calendar month, (2) a listing of securities and other assets (other than cash or cash equivalents) held in the Disbursement Account as of the last day of such calendar month; and (3) the amount of cash and cash equivalents held in the Disbursement Account as of the last day of such calendar month.

Section 1.01.1.          a) Withdrawal of Assets from the Disbursement Account

The signatures of both the Reorganized Debtor and the Disbursing Agent shall be required to draw from the Disbursing Account.  The Disbursing Agent's countersignature will signify the Disbursing Agent's approval (and shall not be unreasonably withheld).  With such countersignature, the Reorganized Debtor may withdraw from the Disbursement Account amounts required for the purpose of paying fees and expenses associated with prosecution of Causes of Action as permitted by the Plan.

The Plan requires that each request for the Disbursing Agent's countersignature be made in the form of a "Reorganized Debtor Withdrawal Notice", as described by the Plan.  Upon the Disbursing Agent's receipt and approval of a Reorganized Debtor Withdrawal Notice, the Disbursing Agent shall countersign the documents necessary to effect the withdrawal by the Reorganized Debtor.  Except in the case of an order of Bankruptcy Court approving such request, the Disbursing Agent shall not countersign such documents if it, in its absolute discretion, does not approve the requested withdrawal to be in the best interests of holders of Allowed Claims and Interests.  The Disbursing Agent shall not unreasonably withhold its consent to any properly made Reorganized Debtor Withdrawal Notice.

In the event that the Reorganized Debtor disagrees with the Disbursing Agent's action in respect of a Reorganized Debtor Withdrawal Notice, the Reorganized Debtor may seek an order of the Bankruptcy Court approving the withdrawal and directing the Disbursing Agent to countersign such documents as may be necessary to effect the withdrawal.  The Disbursing Agent shall comply with such an order of the Bankruptcy Court within the shorter of the time period specified therein, or three (3) business days.

The Disbursing Agent, in the administration of the Disbursement Account, is to be bound solely by the express provisions of the Plan, and such further written and signed directions as the appropriate party or parties may, under the conditions herein provided, deliver to the Disbursing Agent, and shall have no implied duties or obligations.  The Plan specifically limits the Disbursing Agent's duties, obligations and liability. In performing its duties, the Disbursing

Agent is required to exercise the same care and diligence that a trustee appointed under the Bankruptcy Code would observe in these affairs.

~~Section 1.02.~~2.          b)   The Disbursing ~~Agent's~~Agent's   Compensation, Indemnification, Expenses, etc.

~~a)~~The Disbursing Agent shall be paid, as compensation for its services, a fee computed at rates determined by the Disbursing Agent from time to time noticed to the U.S. Trustee, the Bankruptcy Court, Reorganized Debtor, and all parties having requested notices in the Bankruptcy Case, provided that no objection is received by any notified party within 30 days after delivery of notice.  For avoidance of doubt, delivery of such notice is sufficient if made by U.S. mail to the last known address of each such party.  The Disbursing Agent shall be entitled to deduct its compensation and expenses from the Assets held in the Disbursement Account, including but not limited to, payments of dividends, interest and other income in respect of such Assets.

The Disbursing Agent shall be indemnified, and held harmless from any and all liability, loss, damage and expenses (including attorney fees) that the Disbursing Agent may incur or suffer as the result of claims, demands, costs or judgments made or instituted against the Disbursing Agent by reason of the performance of the activities, obligations and duties to be carried out by the Disbursing Agent pursuant to the Plan; provided, however, that the Disbursing Agent is not entitled to indemnification, defense and is not held harmless from any such liability, loss, damage or expense resulting from (i) a failure to adhere to the terms of the Plan, or (ii) gross negligence or willful malfeasance by the Disbursing Agent.

Assets shall be withdrawn from the Disbursement Account for the purpose of paying compensation to, or reimbursement or indemnification of, the Disbursing Agent, only as allowed by an order of the Bankruptcy Court.

~~c)~~The Disbursing Agent may retain and pay professionals on the condition that hourly compensation to such professionals shall be noticed on a monthly basis in fee statements to the U.S. Trustee, the Bankruptcy Court, Reorganized Debtor, and all parties having requested notices in the Bankruptcy Case, and shall be paid by withdrawal from the Disbursement Account provided that no objection is received by any notified party within 30 days after delivery of each monthly fee statement.  For avoidance of doubt, delivery of such notice is sufficient if made by U.S. mail to the last known address of each such party.  Professionals retained by the Disbursing Agent shall submit quarterly fee applications to the Bankruptcy Court detailing the work performed each quarter, hourly rates, and the amounts paid during such quarter from the Disbursement Account. In the event that the Bankruptcy Court does not approve any amount paid to a professional, the amount shall be subject to disgorgement and shall be returned to the Disbursing Agent for deposit in the Disbursement Account.

~~Section 1.03.~~3.          ~~d)~~Resignation or Removal of the Disbursing Agent

The Disbursing Agent may resign at any time by giving not less than ninety (90) days' written notice thereof to the Bankruptcy Court, all Parties in Interest and to the Reorganized Debtor.  The Disbursing Agent may be removed and replaced only upon an appropriate order of the Bankruptcy Court, after motion on notice to all parties having requested notice in this case.

Removal of the Disbursing Agent by the Reorganized Debtor may be accomplished on an expedited basis provided that all parties having requested notices in this case concur and a successor Disbursing Agent is appointed who is acceptable to the Reorganized Debtor and all such parties; *and for avoidance of doubt*, failure of any party to object in a timely fashion to a motion to remove and replace the Disbursing Agent shall be deemed to be consent. Such resignation or removal shall become effective on the acceptance of appointment by a successor Disbursing Agent and the transfer to such successor Disbursing Agent of all Assets in the Disbursement Account in accordance with the Plan.

Upon receipt by the proper Parties of the Disbursing ~~Agent's~~Agent's notice of resignation, an Order of the Bankruptcy Court or the Reorganized ~~Debtor's~~Debtor's uncontested motion for removal, the Reorganized Debtor and the prior Disbursing Agent, or the Bankruptcy Court, shall appoint a successor Disbursing Agent. Thereupon, such successor Disbursing Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the resigning or removed Disbursing Agent, and the resigning or removed Disbursing Agent shall be discharged from any future duties and obligations under this Plan, but the resigning or removed Disbursing Agent shall continue after such resignation or removal to be entitled to the benefits of the indemnities provided herein for the Disbursing Agent.

### Section 1.04.4.        ~~e)~~    Termination of the Disbursement Account

The Disbursement Account, except for the indemnities provided in the Plan, may be terminated at the sole discretion of the Reorganized Debtor upon payment in full of all Allowed Claims and Class 3 Interests in accordance with the terms of the Plan; provided that termination pursuant to this clause (A) shall be effected pursuant to the delivery by the Reorganized Debtor to the Disbursing Agent, with simultaneous delivery to the Plan Representative, of written Notice of Intention to terminate, in substantially the form included in the Plan Supplement, which termination shall be effective as described herein.

~~b)~~Within three (3) Business Days following receipt by the Disbursing Agent of the Notice of Intention, the Disbursing Agent shall give written notification (the "Termination Notice") to the Reorganized Debtor, in substantially the form included in the Plan Supplement, of the date (the "Termination Date") on which the Disbursement Account shall terminate. The Termination Date shall be (a) at least five (5) days but no more than fifteen (15) days subsequent to the date the Termination Notice is given; or (b) such other date mutually agreeable to the Parties.

### Section 1.05.5.        ~~f)~~    Dispute Resolution

In the event of any conflict, disagreement, dispute, or conflicting claims, by or between the Reorganized Debtor and the Disbursing Agent and/or any other person or entity with respect to the Disbursement Account or any element thereof, the affected party(ies) shall be entitled to refuse to comply with any and all claims, demands or instructions so long as such dispute or conflict shall continue, and shall not be or become liable in any way for failure or refusal to comply with such conflicting claims, demands or instructions (but only such claims, demands or instructions), and shall be entitled to refuse to act until, in its sole discretion, either (i) it has received evidence reasonably satisfactory to it that such dispute has been resolved (such as by

receipt of a final order, judgment or decree of the Bankruptcy Court or a subsequent appellate court of competent jurisdiction, which order, judgment or decree is not subject to appeal), or written agreement between the conflicting parties evidencing the resolution of such dispute.  The Disbursing Agent may, in addition, elect, in its sole discretion, to commence in the Bankruptcy Court an interpleader action or seek other judicial relief or orders from the Bankruptcy Court as it may deem, in its sole discretion, necessary.  The costs and expenses (including reasonable attorneys' fees and expenses) incurred in connection with such proceeding shall be paid from the Disbursement Account.  The Bankruptcy Court shall retain jurisdiction, and shall have exclusive jurisdiction, to resolve any disputes involving the Disbursing Agent or interpretation of application of the provisions of the Plan pertaining to the Disbursing Agent.

### ~~Section 1.06.6.~~        ~~g)~~    Disbursing Agent Authority to Accept Settlement or Other Resolution of Causes of Action

The Reorganized Debtor shall notify the Disbursing Agent within five (5) business days of receipt of any settlement offer in respect of a Cause of Action, other than the Aurora Litigation, the Disbursing Agent shall have the power and authority to accept such Cause of Action, if it determines the settlement offer to be in the best interests of the holders of Claims and Interests.  The Disbursing Agent shall notify the Reorganized Debtor in writing, in a manner intended to be received by the Reorganized Debtor most expediently, within one (1) business day of its decision regarding a settlement offer, and not longer than five (5) business days from its receipt of notice thereof.  Upon receipt of notice of a decision by the Disbursing Agent to accept a settlement offer, the Reorganized Debtor may seek an order of the Bankruptcy Court authorizing rejection of such offer and confirmation of the Cause of Action, which order shall be binding on the Disbursing Agent.

### G.    ~~2.~~    Effectuating Documents; Further Transactions

The manager, or the Chief Executive Officer, the Chief Financial Officer, or any other appropriate officer of the Reorganized Debtor shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  In addition, and without limitation of the foregoing, the Secretary or Assistant Secretary of the Reorganized Debtor shall be authorized to certify or attest to any of the foregoing actions.

### 1.    ~~3.~~    Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer from the Debtor to the Reorganized Debtor or any other Person or Entity pursuant to this Plan, the granting or recording of any Lien or mortgage on any property under the Exit Facility, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment.  State or local governmental officials or agents are directed to forego the collection of any such tax or governmental assessment and to accept for Filing and recordation any of the

foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 2.    4.    Corporate Action

On the Effective Date, the adoption and/or filing of the New Governance Documents, as applicable, the appointment of managers and/or officers of the Reorganized Debtor, and all actions contemplated hereby, shall be authorized and approved in all respects pursuant to the Plan. All matters provided for herein involving the corporate structure of the Debtor or Reorganized Debtor, and any corporate action required by the Debtor or Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors, stockholders, members or managers of the Debtor or Reorganized Debtor, except that the Debtor shall take affirmative steps to file the documents necessary to implement the Restructuring Transactions set forth in Section 5.12 (b) of the Plan. On the Effective Date, and pursuant to Section 303 of the General Corporation Law of the State of Delaware, the appropriate officers or managers of the Reorganized Debtor are authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan in the name of and on behalf of the Reorganized Debtor without the need for any required approvals, authorizations, or consents, except for any express consents required under the Plan.

### 3.    5.    Reorganized Debtor's Obligations under the Plan

From and after the Effective Date, the Reorganized Debtor shall exercise its reasonable discretion and business judgment to perform the corresponding obligations under the Plan of its predecessor or predecessor-in-interest. The Plan will be administered and actions will be taken in the name of the Debtor and the Reorganized Debtor, subject to the ~~terms of the Plan relating to the~~ Disbursement ~~Account and Disbursing Agent~~Procedures. From and after the Effective Date, the Reorganized Debtor shall conduct, among other things, the following tasks:

~~a)~~(a)    Administer the Plan and take all steps and execute all instruments and documents necessary to effectuate the terms of the Plan;

~~b)~~(b)    Implement the governance provisions including without limitation the following, which shall be set forth in more detail in the New Governance Documents;

~~c)~~(c)    Accept appointment as Estate Representative and in that capacity, pursue (including, as it determines through the exercise of its business judgment, investigating, conducting discovery, prosecuting, enforcing, objecting to, litigating, reconciling, settling, abandoning, and resolving) all of the rights, Claims, Causes of Action, defenses, and counterclaims retained by the Debtor or the Reorganized Debtor;

~~d)~~(d)    Reconcile Claims and resolve Disputed Claims, and administer the Claims allowance and disallowance processes as set forth in the Plan, including objecting to, prosecuting, litigating, reconciling, settling, and resolving Claims and Disputed Claims in accordance with the Plan;

e)(e)    Make decisions regarding the retention, engagement, payment, and replacement of professionals, employees and consultants;

f)(f)    Subject to ~~sections 5.16 through 5.22 of the Plan (relating to the Disbursing Agent and~~ the Disbursement ~~Account".~~Procedures, administer the Distributions under the Plan, including taking actions necessary to assist the Disbursing Agent in making Distributions in accordance with the terms of the Plan~~, subject to the terms of sections 5.16 through 5.22 of the Plan, :~~

g)(g)    Filing with the Bankruptcy Court on each three (3) month anniversary of the Effective Date reports regarding the status of Causes of Action;

h)(h)    Exercise such other powers as necessary or prudent to carry out the provisions of the Plan;

i)(i)    File appropriate tax returns and make elections allowed under the relevant tax laws; and

j)(j)    Take such other action as may be necessary or appropriate to effectuate the Plan.

The Reorganized Debtor shall also have the power and authority, subject to ~~sections 5.16 through 5.22 of the Plan~~the Disbursement Procedures, to perform the following acts: (a) secure its right title and interest in the assets revested in it by the Plan; (b) acquire possession of all such assets; (c) manage, operate and protect such assets pending their prosecution or sale and the conversion to Cash; (d) pay costs, expenses and fees deemed necessary to preserve such assets; (c) employ professionals, including attorneys, accountants, engineers, agents, brokers, tax specialist, appraisers and clerical and stenographic assistance that may be deemed necessary; (f) exercise Litigation Rights and prosecute and settle or compromise any Cause(s) of Action; (g) prepare and file tax returns and make elections allowed under tax laws; (h) sell or auction such assets for such purchase price and for Cash as deemed appropriate; (i) exchange such assets for other real or personal property; (j) convey title to the such assets; (k) authorize and make interim distributions to holders of Allowed Claims under the Plan; (l) invest proceeds from the sale of such assets in certain limited, conservative investments as specified under the Plan; (m) abandon assets deemed burdensome or of inconsequential value to the Creditors; (n) initiate objections to claims, or file causes of action which could be brought by a Trustee or debtor-in-possession under the Bankruptcy Code; (o) prepare and file with the Bankruptcy Court the Final Report and seek the entry of a Final Decree closing the Debtor's ~~case~~cases; and (p) pay U.S. Trustee fees or file any reports with the U.S. Trustee, without further Court order; *provided however*, that the Reorganized Debtor's power and authority shall not be limited to those acts enumerated herein and the Reorganized Debtor's Governing Documents shall control and define the scope of the Reorganized Debtor's powers, authority and purposes.

Notwithstanding the foregoing, the Reorganized Debtor shall not engage in any activity that constitutes the conduct of a trade or business except to the extent reasonably necessary to and consistent with, the purposes set forth in the Plan and Plan Supplement (which shall include Corporate Governance Documents for the Reorganized Debtor).

–In addition, the Reorganized Debtor may retain professionals on a straight contingency fee basis or on an hourly basis on the condition that hourly compensation to such professionals shall be noticed on a monthly basis in fee statements to the U.S. Trustee, the Bankruptcy Court, Reorganized Debtor, and all parties having requested notices in the Bankruptcy Case, and shall be paid by withdrawal from the Disbursement Account (subject to the Disbursement Procedures) provided that no objection is received by any notified party within 30 days after delivery of each monthly fee statement.  For avoidance of doubt, delivery of such notice is sufficient if made by U.S. mail to the last known address of each such party.   Professionals retained by the Reorganized Debtor shall submit quarterly fee applications to the Bankruptcy Court detailing the work performed each quarter, hourly rates, and the amounts paid during such quarter from the Disbursement Account. In the event that the Bankruptcy Court does not approve any amount paid to a professional, the amount shall be subject to disgorgement and shall be returned to the Disbursing Agent for deposit in the Disbursement Account.

The United States Trustee is not responsible for the supervision or oversight of the Reorganized Debtor.

F.H.    Payment of Claims and Equity Interests

The Plan classifies Claims and Equity Interests separately in accordance with the Bankruptcy Code and provides for different classes of Claims and Equity Interests.

Only holders of Allowed Claims and Interests are entitled to receive Distributions under the Plan.  Allowed Claims are Claims that are not in dispute, are not contingent, are liquidated in amount, and are not subject to objection or estimation.  Any Claim or Interest that is identified as disputed in the Plan, that is the subject of a pending objection or counterclaim or as to which there is a proceeding pending as of the Confirmation Date pursuant to § 510(c) of the Bankruptcy Code is defined in the Plan as a Disputed Claim.  All Distributions or other transfers of Cash available to holders of Allowed Claims will be made in accordance with the various treatment provisions contained in the Plan for each Class of Claim holders. and subject to the Disbursement Procedures.  The treatment afforded to each Class of Claims varies by Class.

In accordance with the Plan or the Confirmation Order, the treatment of any Claim or Interest will be in full satisfaction, and release of and in exchange for such Claim or Interest, and in full satisfaction of the Equity Interests which are being extinguished under the Plan.  Article II of the Plan provides for the classification of Claims and Equity Interests.  Article III of the Plan provides for the treatment of Classes of Claims and Equity interests as classified under the Plan. The following discussion summarizes the proposed treatment of Class 1 Administrative Expense Claims.  The classification scheme and treatment proposed by the Debtor for Claims and Equity Interests in Article V of the Plan and is qualified in its entirety by, and subject in all respects to, the terms of the Plan.  A copy of the Plan is attached hereto as Exhibit A, and should be read carefully by you in considering whether to vote to accept or reject the Plan.

A.1.    Payment of Administrative Expense and Professional Fee Claims

Subject to the Disbursement Procedures, Allowed Administrative Claims and Professional Fee Claims shall be paid by the Debtor or the Reorganized Debtor, as the case may be, in full, in Cash, unless otherwise ordered by the Bankruptcy Court, upon the later of the

Effective Date or the Allowance Date, unless the holders of such allowed Administrative Claims and Professional Fee Claims agree to a different treatment.

2.      Description of Administrative Expense and Professional Fee Claims

Administrative Expense Claims represent those expenses that are allowed pursuant to § 503(b) of the Bankruptcy Code and are entitled to priority under § 507(a)(1) of the Bankruptcy Code.   These include expenses for the actual and necessary costs of preserving the Debtor's estates.

A debtor is authorized by a bankruptcy court to retain attorneys, accountants and other professionals to assist the debtor during the course of a bankruptcy case.   Section 330 of the Bankruptcy Code provides that a bankruptcy court may authorize a debtor to pay these professionals for the services performed by those professionals.   Section 503(b)(1) of the Bankruptcy Code provides that claims for fees accruing for such services constitute administrative expense claims.

An administrative expense claim may also arise if: (i) a debtor defaults under the terms of any executory contract or unexpired lease assumed pursuant to a final order of a bankruptcy court under § 365 of the Bankruptcy Code or under the terms of a contract or lease entered into by a debtor after the petition date; or (ii) a debtor ultimately rejects an unexpired lease or executory contract that has not previously been assumed (provided the debtor receives a post-petition benefit under such contract).

Section 1129(a)(9)(A) of the Code provides that all holders of allowed administrative expense claims must be paid in full, in Cash, on the effective date of a plan of reorganization unless the holder thereof agrees to a different treatment.   The Debtor has estimated that the total amount of all known and unpaid Allowed Administrative Claims and Allowed Professional Fee Claims in the instant Case, after objections and/or voluntary reductions as of the Confirmation Date, will be approximately $[~~~~~~~~~~].$377,552.08.

The following estimated Administrative Claims and Professional Fee Claims are known to the Debtor:

1.(a)     the administrative claim of Hogan Lovells US LLP for its services as counsel to the Debtor-in-possession in this case which is estimated to be approximately $[~~~~~~~~~];$123,686;

2.(b)     the administrative claim of Bayard, P.A., for its services as Delaware counsel to the Debtor-in-possession in this case which is estimated to be approximately $[~~~~~~~~~];$75,000;

3.(c)     the administrative claim of Williams & Connolly LLP for its services as litigation counsel to the Debtor in this casethese cases which is estimated to be approximately $[~~~~~~~~~];$150,000;

4.(d)    the administrative claim of Haddon, Morgan and Foreman PC for its services as appellate counsel to the Debtor in ~~this case~~these cases which is estimated to be approximately ~~$[_____];~~$40,000;

5.    ~~the administrative claim of EKS&H for its services as financial services provider to the Debtor in this case which is estimated to be approximately $[_____];~~

6.(e)    miscellaneous Administrative Expense Claims for rent, storage, management services and similar expenses which are estimated to be ~~below $[_____];~~$13,868.35;

7.(g)    the administrative claim for fees of the Office of the United States Trustee, to be paid by the Debtor on a quarterly basis and calculated based upon the disbursements made by the Debtor during such quarter.

The professionals and administrative claimants, with the exception of the Office of the United States Trustee, shall file applications before the Bankruptcy Court seeking approval of the total amount of their Professional Fee Claims on or prior to the Administrative Bar Date, which shall be not later than forty five (45) days after the Effective Date, or such other date scheduled by the Court.

The Debtor's estimate of ~~$[_____]~~$377552.08 for total Administrative Claims and Professional Fee Claims assumes the occurrence of the Confirmation Date on or prior to December ~~15~~17, 2015 and is the Debtor's best good faith estimate of such Claims.  The Debtor's estimate is subject to change based upon the passage of time.  Numerous factors and contingencies may cause the actual amount of allowed Administrative Expense Claims to exceed or fall short of the Debtor's estimate.  The estimated allowed Professional Fee Claims include professional fees that are either previously awarded and not paid as of the Confirmation Date, and those not yet awarded as of that date.

If the case is converted to Chapter 7, the Allowed Administrative Claims and the Allowed Professional Fee Claims incurred during the Chapter 11 process will be subordinated to the Administrative Claims incurred during the Chapter 7.  There is also a possibility that the Chapter 11 Administrative Expense Claims will be reduced by the Court if the Plan is not confirmed and the case is converted.

## ARTICLE V

## TREATMENT OF EXECUTORY CONTRACTS,
## PAYMENT OF INTEREST AND DISTRIBUTIONS

A.      Unexpired Leases and Executory Contracts

All Executory Contracts and Unexpired Leases not otherwise assumed, assumed and assigned, or rejected pursuant to a Final Order prior to the Effective Date shall be deemed rejected as of the Effective Date.  Entry of the Confirmation Order shall constitute the approval, pursuant to § 365(a) of the Bankruptcy Code, of (i) the assumption or assumption and assignment of the Executory Contracts and Unexpired Leases identified on Exhibit FA attached to this Disclosure Statement; and (ii) the rejection of the remaining Executory Contracts and Unexpired Leases.

Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into by the Debtor in connection with the Plan, as of the Effective Date, the Debtor shall be deemed to have rejected each prepetition written Executory Contract and Unexpired Lease to which it is a party unless such Executory Contract or Unexpired Lease (a) is expressly assumed or rejected pursuant to a Final Order prior to the Confirmation Date, (b) previously expired or terminated pursuant to its own terms, (c) is listed on the Schedule of Unexpired Executory Contracts and Unexpired Leases To Be Assumed filed as Exhibit FA to this Disclosure Statement, (d) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition Filed by the Debtor on or before ten (10) days prior to the Confirmation Date

Notwithstanding anything to the contrary in the Plan, the Debtor and the Reorganized Debtor reserve the right to assert that any license, franchise and partially performed contract is a property right and not an Executory Contract.  Specifically, although the SLS APA is listed on the Debtor's Schedules as an Executory Contract, the Debtor has determined, and the Reorganized Debtor will take the position that, the SLS APA is not executory, as no material performance remains due from the Debtor under the SLS APA.

In the event of a dispute as to whether a contract or lease between the Debtor and a Person that is not an Insider is executory or unexpired, the right of the Debtor or the Reorganized Debtor to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract or lease is executory or unexpired, provided such dispute is pending as of the Confirmation Date

Contracts or leases entered into after the Petition Date will be performed by the Reorganized Debtor in the ordinary course of business.  The Plan further provides that notwithstanding anything to the contrary in any contract, agreement or lease to which the Reorganized Debtor is a party, (a) the transactions contemplated by the Plan and (b) the consequences of the Plan's implementation shall not trigger any change of control or similar provisions and shall not be voided by any restraints against assignment in any contract, agreement or lease governed by the Plan.

Unless the Bankruptcy Court, the Bankruptcy Code, the Bankruptcy Rules or the local Bankruptcy Rules establish an earlier deadline with regard to the rejection of particular Executory Contracts, and Unexpired Leases any Claims arising out of the rejection of Executory Contracts and Unexpired Leases must be filed with the Bankruptcy Court and served upon the Debtor, and the U.S. Trustee no later than thirty (30) days after the Confirmation Order.  Any Claims not filed within such time will be forever barred and will not receive any distributions under the Plan.  All Claims arising from the rejection of an Executory Contract or Unexpired Lease shall be treated as Class 3 Claims under the Plan.

B.      Distributions for Allowed Claims.

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, all Distributions to Holders of Allowed Claims as of the applicable Distribution Date shall be made on or as soon as practicable after the applicable Distribution Date.  Distributions on account of Claims that first become Allowed Claims after the applicable Distribution Date shall be made on such day as selected by the Reorganized Debtor, in its sole discretion, subject to approval of such date by the Disbursing Agent. The Reorganized Debtor shall have the right, in its sole and absolute discretion, to accelerate any Distribution Date occurring after the Effective Date if the facts and circumstances so warrant.

3.C.    Interest on Claims.

Unless otherwise specifically provided for in the Plan or the Confirmation Order, post-petition interest shall not accrue or be paid on Claims or Interests, and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any Claim.  Unless otherwise specifically provided for in the Plan or the Confirmation Order, interest shall not accrue or be paid upon any Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Claim becomes an Allowed Claim.

4.D.    Designation; Distributions by Disbursing Agent.

The Disbursing Agent shall make all Distributions required to be made to Holders of Class 3 Claims, on the respective Distribution Dates under the Plan and such other Distributions to other Holders of Claims or Interests in the Debtor as are required to be made.   The Reorganized Debtor shall comply with the terms of the Plan in making all such Distributions.

The Disbursing Agent shall receive, without further approval from the Bankruptcy Court, reasonable compensation for distribution services rendered pursuant to the Plan and reimbursement of reasonable out of pocket expenses incurred in connection with such services from the Reorganized Debtor.  No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

5.E.    Means of Cash Payment

The Plan provides that cash payments shall be made in U.S. funds, and shall be made, subject to the Disbursement Procedures, at the option, and in the sole discretion, of the Reorganized Debtor, as approved by the Disbursing Agent.  Cash payments to foreign Creditors

may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.  Cash payments made pursuant to this Plan in the form of checks issued by the Disbursing Agent or Reorganized Debtor shall be null and void if not cashed within 120 days of the date of the issuance thereof.  Requests for reissuance of any check shall be made directly to the Reorganized DebtorDisbursing Agent.

For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency shall be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

### 6.F.    Fractional Distributions

The Plan does not permit cash payments of fractions of cents.  Fractional cents shall be rounded to the nearest whole cent (with .5 cent or less to be rounded down).

### G.    *De MinimisMinimus* Distributions

Notwithstanding anything to the contrary contained in the Plan, the Disbursing Agent shall not be required to distribute, and shall not distribute, Cash or other property to the Holder of any Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim is less than $50.  Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed is less than such amount shall have such Claim discharged and shall be forever barred from asserting such Claim against the Debtor, the Reorganized Debtor or their respective property.  Any Cash or other property not distributed pursuant to this provision shall be the property of the Reorganized Debtor, free of any restrictions thereon.

### 8.H.    Delivery of Distributions

Distributions to Holders of Allowed Claims shall be made by the Disbursing Agent (a) at the addresses set forth on the Proofs of Claim Filed by such Holders, (b) at the addresses reflected in the Schedules if no Proof of Claim has been Filed, or (c) at the addresses set forth in any written notices of address changes delivered to the Debtor, the Reorganized Debtor or the Disbursing Agent after the date of any related Proof of Claim or after the date of the Schedules if no Proof of Claim was Filed.  If any Holder's Distribution is returned as undeliverable, a reasonable effort shall be made to determine the current address of such Holder, but no further Distributions to such Holder shall be made unless and until the Disbursing Agent is notified of such Holder's then current address, at which time all missed Distributions shall be made to such Holder without interest.  Unless otherwise agreed between the Reorganized Debtor and the Disbursing Agent, amounts in respect of undeliverable Distributions made by the Disbursing Agent shall be returned to the Reorganized Debtor, and held in trust by the Reorganized Debtor, until such Distributions are claimed, at which time the applicable amounts shall be returned to the Disbursing Agent for distribution pursuant to the Plan.  All claims for undeliverable Distributions must be made on or before the second (2nd) anniversary of the Initial Distribution Date, after which date all unclaimed property shall revert to the Reorganized Debtor free of any restrictions thereon and the claims of any Holder or successor to such Holder with respect to

such property shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Nothing contained in the Plan shall require the Debtor, the Reorganized Debtor or any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

### 9.I.    Application of Distribution Record Date

At the close of business on the Distribution Record Date, the claims registers for all Claims shall be closed, and there shall be no further changes in the record Holders of such Claims.  Except as provided herein, the Reorganized Debtor, the Disbursing Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize any transfer of Claims occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record Holders stated on the claims registers as of the close of business on the Distribution Record Date irrespective of the number of Distributions to be made under the Plan to such Persons or the date of such Distributions.

### 10.J.    Withholding, Payment and Reporting Requirements

In connection with the Plan and all Distributions under the Plan, the Disbursing Agent shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding, payment, and reporting requirements.  The Disbursing Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements. Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed General Unsecured Claim that has become an Allowed General Unsecured Claim, any tax obligation that would be imposed upon the Reorganized Debtor in connection with such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Reorganized Debtor in connection with such Distribution.  Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution pursuant to Section 7.06 of the Plan.

### 11.K.    Setoffs

The Reorganized Debtor may, but shall not be required to, set off against any Claim or any Allowed Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtor or the Reorganized Debtor has against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any such claim that the Debtor or the Reorganized Debtor may have against such Holder.

12.L.   Pre-Payment

Except as otherwise provided in the Plan, any ancillary documents entered into in connection herewith, or the Confirmation Order, the Reorganized Debtor shall have the right (subject to the Disbursement Procedures) to pre-pay, without penalty, all or any portion of an Allowed Claim entitled to payment in Cash at any time.

13.M.   No Distribution in Excess of Allowed Amounts

Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim (excluding payments on account of interest due and payable from and after the Petition Date pursuant to the Plan, if any).

14.N.   Allocation of Distributions

All Distributions received under the Plan by Holders of Claims shall be deemed to be allocated first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to such Claim.

## ARTICLE VI

## PLAN PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND DISTRIBUTIONS WITH RESPECT THERETO

1.A.   The Plan includes the following procedures for prosecution of Objections to and Estimation of Claims.

All objections to Claims must be Filed and served on the Holders of such Claims by the Claims Objection Bar Date, as the same may be extended by the Bankruptcy Court upon motion by the Debtor, the Reorganized Debtor or any other party-in-interest.  If a timely objection has not been Filed to a Proof of Claim or the Schedules have not been amended with respect to a Claim that (i) was Scheduled by the Debtor but (ii) was not Scheduled as contingent, unliquidated, and/or disputed, the Claim to which the Proof of Claim or Scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been Allowed earlier.  No payments or Distributions shall be made on account of a Claim until such Claim becomes an Allowed Claim.  Notice of any motion for an order extending any Claims Objection Bar Date shall be required to be given only to those Persons or Entities that have requested notice in the Chapter 11 Case, or to such Persons as the Bankruptcy Court shall order.

The Debtor (prior to the Effective Date) or Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Reorganized Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed

amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court, as applicable.  If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanisms.

The Reorganized Debtor will have no obligation to review and/or respond to any Claim that is not filed by the applicable Bar Date unless: (i) the filer has obtained an order from the Bankruptcy Court authorizing it to File such Claim; or (ii) the Reorganized Debtor has consented to the Filing of such Claim in writing.

After the Effective Date, only the Reorganized Debtor shall have the authority to File objections to Claims and to settle, compromise, withdraw, or litigate to judgment objections to Claims, including, without limitation, Claims for reclamation under section 546(c) of the Bankruptcy Code.  The Reorganized Debtor may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

   2.B.    The Plan provides the following treatment of Disputed Claims.

        a)1.    No Distribution Pending Allowance

No payments or Distributions will be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Disputed Claim becomes an Allowed Claim.

        b)2.    Distributions on Account of Disputed Claims Once They are Allowed.

The Disbursing Agent shall, on the applicable Distribution Dates, make Distributions on account of any Disputed Claim that has become an Allowed Claim.  Such Distributions shall be made pursuant to the provisions of the Plan governing the applicable Class.  Such Distributions shall be based upon the Distributions that would have been made to the Holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

   C.    Reserve Accounts

   3.The Plan requires that the Debtor and Reorganized Debtor shall, subject to and in accordance with the provisions of the Plan, including but limited to sections 5.16 -5.22 of the PlanDisbursement Procedures, establish one or more general accounts (defined by the Plan as the "Disbursement Account")- into which shall be deposited all funds not required to be deposited into any other account, reserve or escrow.  The Plan also allows the Reorganized Debtor to create, fund and withdraw funds from, as appropriate (and subject to sections 5.16 through 5.22 of the Planthe Disbursement Procedures), certain sub-accounts of the Disbursement Account: an Administrative Claims Reserve, and a Professional Fee Reserve.  If -practicable, the Reorganized DebtorDisbursing Agent will invest any Cash that is withheld as the applicable claims reserve in an appropriate manner to ensure the safety of the investment.

### a)1.    Administrative Claims Reserve

On the Effective Date (or as soon thereafter as is practicable), the Debtor or Reorganized Debtor may create and fund the Administrative Claims Reserve in the amount budgeted to be used by the Reorganized Debtor to pay Distributions on account of Allowed Administrative Claims, including Claims under section 503(b)(9) of the Bankruptcy Code and lease payments under section 365(d)(5) of the Bankruptcy Code.  To the extent necessary to fund payments to Allowed Claims thereunder, the funds in the Administrative Claims Reserve shall be periodically replenished by the Reorganized Debtor, subject to approval by the Disbursing Agent, in such amounts as may be determined by the Reorganized Debtor.  The Reorganized Debtor shall be obligated to pay all Allowed Administrative Claims designated to be paid from the proceeds of the Administrative Claims Reserve thereunder in excess of the amounts actually deposited in the Administrative Claims Reserve.  In the event that any Cash remains in the Administrative Claims Reserve after payment of all Allowed Administrative Claims to be paid thereunder, such Cash shall, in the event that Class 3 Claims have not been paid in full, be distributed to the Disbursing Agent, and after payment of all Class 3 Claims in full, to the Reorganized Debtor for the satisfaction of the claims of Classes 4 and 5.

### 2.    (b)    Professional Fee Reserve

The Debtor or Reorganized Debtor may create and fund the Professional Fee Reserve on the Effective Date (or as soon thereafter as is practicable) in the amount of the budgeted but unpaid Professional fees projected through the Effective Date, which amount shall be used to pay Allowed Professional Fee Claims held by any professionals working on behalf of the Debtor.  The Reorganized Debtor shall be obligated to pay all Allowed Professional Fee Claims even if in excess of the amounts actually deposited in the Professional Fee Reserve.  In the event that any Cash remains in the Professional Fee Reserve after payment of all Allowed Professional Fee Claims, such Cash will be distributed to the Reorganized Debtor as provided by Section 7.07 hereofof the Plan.

### 3.    (c)    Disputed Claims Reserve

On the Effective Date and on each subsequent Distribution Date, the Disbursing Agent shall withhold on a *Pro Rata* basis from property that would otherwise be distributed to Classes of Claims entitled to Distributions under the Plan on such date, in a separate Disputed Claims Reserve, which shall be a sub-account of the Disbursement Account, such amounts or property as may be necessary to equal one hundred percent (100%) of Distributions to which Holders of such Disputed Claims would be entitled under this Plan if such Disputed Claims were allowed in their Disputed Claim Amount.  The Debtor or Reorganized Debtor may request, if necessary, estimation for any Disputed Claim that is contingent or unliquidated, or for which the Debtor or Reorganized Debtor determine to reserve less than the Face Amount.  The Disbursing Agent shall withhold the applicable portion of the Disputed Claims Reserve with respect to such Claims based upon the estimated amount of each such Claim as estimated by the Bankruptcy Court.  If the Debtor or Reorganized Debtor electelects not to request such an estimation from the Bankruptcy Court with respect to a Disputed Claim that is contingent or unliquidated, the Disbursing Agent shall withhold the applicable Disputed Claims Amount based upon the Reorganized Debtor's good faith estimate of the amount of such Claim after the Effective Date.

If practicable, the any Cash that is withheld as the applicable Disputed Claims Reserve will be invested by the Disbursing Agent   in an appropriate manner to ensure the safety of the investment.   Nothing in this Plan or the Disclosure Statement shall be deemed to entitle the Holder of a Disputed Claim to post-petition interest on such Claim, however, except as otherwise provided in the Plan.

## ARTICLE VII

### CONDITIONS PRECEDENT TO CONFIRMATION
### AND CONSUMMATION OF THE PLAN

A.      Conditions to Occurrence of Confirmation.

~~1.~~The Plan requires that the following conditions precedent to the occurrence of the Confirmation Date must be satisfied unless any such condition shall have been waived by the Debtor:

~~a)~~1.    The Confirmation Order shall have been entered in form and substance satisfactory to the Debtor, and shall, among other things:

~~(i)~~(a)    provide that the Debtor and the Reorganized Debtor are authorized and directed to take all actions necessary or appropriate to enter into, implement, and consummate the Plan and all related contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan or necessary to implement the Plan;

~~(ii)~~(b)  authorize the issuance of the New Common LLC Interests;

~~(iii)~~(c)  deem the releases in favor of SLS by Aurora pursuant to~~-~~ Section 11.10 to be an Aurora Resolution Event, as defined by the SLS APA, and direct the Escrow Agent to release all funds held in the SLS Escrow to Debtor; ~~and~~

(d)      appoint the Disbursing Agent; and

~~(iv)~~(e)  direct the Debtor's Principals to make the Contribution, as required by the Plan.

~~(b)~~2.    The Bankruptcy Court finds that adequate information and sufficient notice of the Disclosure Statement, the Plan and the Confirmation Hearing, along with all deadlines for voting on or objecting to the Plan have been given to all relevant parties in accordance with the solicitation procedures governing such service and in substantial compliance with Bankruptcy Rules 2002(b), 3017, 3018, 9019, and 3020(b); and

~~(c)~~3.    The Plan and all Plan Supplement documents, including any exhibits, schedules, amendments, modifications or supplements thereto, shall be acceptable to the Debtor.

B.      Conditions to Occurrence of Effective Date.

~~2.~~The Plan requires that the following conditions precedent to the occurrence of the Effective Date must be satisfied or waived by the Debtor on or prior to the Effective Date in accordance with Section 9.04 of the Plan:

b)1.     Each of the exhibits to the Plan and any other necessary documents shall be fully executed and delivered to the Debtor, shall be in form and substance reasonably acceptable to the Debtor, and shall be fully enforceable in accordance with their terms;

2.      The Disbursing Agent shall have accepted appointment pursuant to the Confirmation Order;

c)3.     The funds held in the SLS Escrow shall have been delivered to the Debtor.

C.      Notice of Occurrence of Effective Date.

3.The Debtor or Reorganized Debtor shall file a notice of the occurrence of the Effective Date within five (5) business days thereafter.

4.The Plan allows that the conditions set forth in Section 9.0204(a)(i) may be waived in whole or in part by the Debtor without any notice to parties-in-interest or the Bankruptcy Court and without a hearing.

D.      Consequences of Non-Occurrence of Effective Date:.

5.If the Confirmation Order is vacated, (a) the Plan shall be null and void in all respects; (b) any settlement of Claims or Interests in the Debtor provided for hereby shall be null and void without further order of the Bankruptcy Court; and (c) to the extent permitted under the Bankruptcy Code, the time within which the Debtor may assume and assign or reject all Executory Contracts and Unexpired Leases shall be extended for a period of one hundred twenty (120) days after the date the Confirmation Order is vacated.

## ARTICLE VIII

## RETENTION OF JURISDICTION

The Plan provides for retention by the Bankruptcy Court of jurisdiction under sections 105(a) and 1142 of the Bankruptcy Code and any stipulations entered into by the Debtor with any Creditor, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, this Chapter 11 Case and the Plan to the fullest extent permitted by law (provided, however, that notwithstanding the foregoing, with respect to all civil proceedings arising in or related to the Chapter 11 Case and the Plan, the Bankruptcy Court shall have original but not exclusive jurisdiction, in accordance with section 1334(b) of title 28 of the United States Code), including, among other things, jurisdiction to:

a)1.     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status of any Claim or Interest not otherwise Allowed under the Plan (other than personal injury or wrongful death Claims, unless agreed by the Holder), including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests in the Debtor;

b)2.    hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 328, 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code; provided, however, that from and after the Effective Date, the payment of the fees and expenses of the Professionals of the Reorganized Debtor shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

c)3.    hear and determine all matters with respect to the assumption or rejection of any Executory Contract or Unexpired Lease to which the Debtor is a party or with respect to which the Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

d)4.    effectuate performance of and payments under the provisions of the Plan and enforce remedies upon any default under the Plan;

e)5.    hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case (including under the SLS Jurisdiction Agreement), the Avoidance Actions, the Aurora Litigation, the Litigation Rights, Causes of Action or the Plan, including without limitation the enforcement of the injunction provisions contained in Section 11.12 of the Plan;

f)6.    enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

g)7.    hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

h)8.    consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

i)9.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

j)10.    enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

k)11.    hear and determine any matters arising in connection with or relating to the Plan, the schedules to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, including the Plan Supplement, the schedules to the Plan, the Disclosure Statement, and/or the Confirmation Order;

l)12.    enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

m)13.  except as otherwise limited herein, recover all assets of the Debtor and property of the Estate, wherever located;

n)14.    hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

o)15.    hear and determine all disputes involving the existence, nature, or scope of the Debtor's discharge;

p)16.    hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, the provisions of the Bankruptcy Code; and

q)17.    enter a final decree closing the Chapter 11 Case.

The Plan further provides that if the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, including any matters set forth in Section 10.01 of the Plan, the jurisdiction retention provisions shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

1.A.    Administrative Claims

All Administrative Expense Requests (other than as set forth in Sections 3.01(a), 11.02 or this Section 11.01 of the Plan) must be made by application Filed with the Bankruptcy Court and served on counsel for the Reorganized Debtor **no later than forty-five (45) days after the Effective Date** or their Administrative Claims shall be forever barred.  In the event that the Reorganized Debtor objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.  Notwithstanding the foregoing, (a) no application seeking payment of an Administrative Claim need be Filed with respect to an undisputed post-petition obligation which was paid or is payable by the Debtor in the ordinary course of business, including obligations to Insiders as set forth in the monthly budgets attached to the Debtor's monthly operating reports; provided, however, that in no event shall a post-petition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other

disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; and (b) no application seeking payment of an Administrative Claim need be Filed with respect to Cure owing under an Executory Contract or Unexpired Lease if the amount of Cure is fixed or proposed to be fixed by order of the Bankruptcy Court pursuant to a motion to assume and fix the amount of Cure Filed by the Debtor and a timely objection asserting an increased amount of Cure Filed by the non-Debtor party to the subject contract or lease; provided further, however, that post-petition statutory tax claims shall not be subject to the Administrative Claims Bar Date.

With respect to Administrative Claims, the last day for Filing an objection to any Administrative Expense Claim will be the later of (a) 180 days after the Effective Date, (b) 90 days after the filing of such Administrative Claim or (c) such other date specified in the Plan or ordered by the Bankruptcy Court.

### 2.B.    Professional Fee Claims

All final requests for payment of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code must be made by application Filed with the Bankruptcy Court and served on the Reorganized Debtor, their counsel, and other necessary parties-in-interest **no later than forty-five (45) days after the Effective Date**, unless otherwise ordered by the Bankruptcy Court.  Objections to such applications must be Filed and served on the Reorganized Debtor, its counsel, and the requesting Professional or other Entity on or before the date that is thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application was served.

### 3.C.    Payment of Statutory Fees

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  All such fees that arise after the Effective Date shall be paid by the Reorganized Debtor., subject to the Disbursement Procedures.  The obligation of each of the Reorganized Debtor to pay quarterly fees to the Office of the United States Trustee pursuant to section 1930 of title 28 of the United States Code shall continue until such time as the Debtor's case is closed.

### 4.D.    Modifications and Amendments

The Debtor may alter, amend, or modify the Plan or any exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.  The Debtor shall provide notice to all parties having requested notices in the Bankruptcy Case of such amendments or modifications as may be required by the Bankruptcy Rules or order of the Bankruptcy Court.  A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim or Interest of such Holder.  In the event of any dispute as to whether such proposed alteration, amendment, modification, or clarification materially and adversely changes the treatment of the Claim or Interest of any such Holder, the Debtor shall bear the burden of

demonstrating that such proposed alteration, amendment, modification, or clarification does not materially adversely change the treatment of the Claim or Interest of such Holder.

After the Confirmation Date and prior to substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of the Plan, the Debtor or Reorganized Debtor, as applicable, may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims or Interests in the Debtor under the Plan; provided, however, that, to the extent required, prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court. A Holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim or Interest of such Holder. In the event of any dispute as to whether such proposed alteration, amendment, modification, or clarification materially and adversely changes the treatment of the Claim or Interest of any such Holder, the Debtor or Reorganized Debtor, as the case may be, shall bear the burden of demonstrating that such proposed alteration, amendment, modification, or clarification does not materially adversely change the treatment of the Claim or Interest of such Holder.

### 5.E.    Continuing Exclusivity and Solicitation Period

Subject to further order of the Bankruptcy Court, until the Effective Date, the Debtor shall, pursuant to section 1121 of the Bankruptcy Code, retain the exclusive right to amend the Plan and to solicit acceptances thereof, and any modifications or amendments thereto.

### 6.F.    Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtor, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 7.G.    Successors and Assigns and Binding Effect

The rights, benefits, and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator,

personal representative, successor, or assign of such Person or Entity, including, but not limited to, the Reorganized Debtor and all other parties-in-interest in the Chapter 11 Case.

8.H.    Compromises and Settlements

From and after the Effective Date, subject to the ~~terms of sections 5.16 through 5.22 of the Plan~~Disbursement Procedures, the Reorganized Debtor may compromise and settle various Claims against or Interests in the Debtor, Litigation Rights, and/or Avoidance Actions that they may have against other Persons or Entities without any further approval by the Bankruptcy Court.

Until the Effective Date, the Debtor expressly reserves the right to compromise and settle (subject to the approval of the Bankruptcy Court~~).~~) Claims against or Interests in the Debtor, Avoidance Actions, Litigation Rights or other claims that it may have against other Persons or Entities.

9.I.    Releases and Satisfaction of Subordination Rights

All Claims against the Debtor and all rights and claims between or among the Holders of Claims relating in any manner whatsoever to any claimed subordination rights shall be deemed satisfied by the Distributions under, described in, contemplated by, and/or implemented in Article III of the Plan.  Distributions under, described in, contemplated by, and/or implemented by the Plan to the various Classes of Claims or Interests hereunder shall not be subject to levy, garnishment, attachment, or like legal process by any Holder of a Claim or Interest by reason of any claimed subordination rights or otherwise, so that each Holder of a Claim or Interest shall have and receive the benefit of the Distributions in the manner set forth in the Plan.

10.J.    THE PLAN PROVIDES BROAD RELEASES AND FOR THE DISCHARGE AND EXCULPATION OF VARIOUS PARTIES.

1.    Releases of Causes of Action held by the Debtor and Estate against the Debtor's Principals, and the Directors, Officers, Employees or Advisors of the Debtor.

The Plan provides for the following ~~Releases by Debtor:~~Release of Causes of Action held by the Debtor and Estate against the Debtor Principals, and the directors, officers, employees or advisors of the Debtor.

**As of the Effective Date, for good and valuable consideration, and to the extent permitted under Delaware law, ~~Holders of Claims and Interests that (i) has held, currently holds or may hold a Released Claim or any Released Third Party Cause of Action (each as defined herein), (ii) is entitled to receive, directly or indirectly, a distribution in satisfaction of its Claim or Equity Interest pursuant to the Plan, and (iii) elects, by not checking or by checking the appropriate box on its Ballot or election form, as the case may be , to grant the releases set forth in this section 11.10, on their own behalf and on behalf of anyone claiming through them, shall be deemed to have and hereby does~~the Debtor and Estate conclusively, absolutely, unconditionally, irrevocably and forever release ~~and discharge~~ the ~~Debtor, Debtor~~Debtor's Principals, ~~the Reorganized Debtor, other Holders of Claims or Interests (except such other Holders of Claims owing obligations under policies of insurance issued to the Debtor or the Estate)~~ and the directors, officers, employees or advisors of the Debtor ~~as of the Petition Date and through the Effective Date~~ (the**

**"Releasees"), from** Released Claims, which are defined in section 1.97 of the Plan as **any and all claims, obligations, suits, judgments, demands, debts, rights, Causes of Action (including Litigation Rights and Avoidance Actions), and  liabilities whatsoever in connection with or related to the Debtor, the conduct of the Debtor's business, the Chapter 11 Case, or the Plan** (other than the rights of the Debtor, the Reorganized Debtor or a Creditor holding an Allowed Claim to enforce the obligations under the Confirmation Order and the Plan and the contracts, instruments, releases, indentures, and other agreements or documents assumed or delivered thereunder),**, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the conduct of the Debtor's business, the Reorganized Debtor, the Chapter 11 Case, the Disclosure Statement or the Plan, and that may be asserted by or on behalf of the Debtor**, the Estate, or the Reorganized Debtor against any of the shareholders, directors, officers, employees or advisors of the Debtor, as of the Petition Date and through the Effective Date **or the Estate, excluding any claims arising from fraud, gross negligence, or willful misconduct;** provided**, however, that nothing in** this Section**section 11.10(a)**:**) of the Plan:**

      **(i)  shall be deemed to prohibit the Reorganized Debtor from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, Causes of Action or liabilities they may have against any employee (including directors and officers) for alleged breach of confidentiality, or any other contractual obligations owed to the Debtor or the Reorganized Debtor, including non-compete and related agreements or obligations;**

      **(ii)  constitutes a waiver of any right of the Reorganized Debtor to: (x) enforce all rights and claims concerning any and all intellectual property (including, without limitation, trademarks, copyrights, patents, customer lists, trade secrets and confidential or proprietary business information), all of which rights are expressly reserved and not released and (y) assert any defense based on whether or not applicable standards have been met; or**

      (iii)  shall be deemed to prohibit any party from asserting or enforcing against any Releasee any Direct Contractual Obligation[2], with all rights and defenses to such claims being reserved by the Releasees; and

**It being further** provided **that the release effected by** this paragraph**section 11.10(a) of the Plan shall not be effective as to any** Holder of a Class A Interest in **of the** Debtor**Debtor's Principals until the** earlier of 120**date occurring thirty (30) days after the** effective date or the **date on which an independent investigator to be appointed by the Bankruptcy Court**

---

[2]  The term "Direct Contractual Obligation" is defined by the Plan to mean "an obligation under a written and enforceable contract to take or to refrain from taking prospective action, other than to pay money, non-compliance with which would cause material damage or loss to the other contract party, or give rise to rights of indemnification under the contract, and for avoidance of doubt, shall include the obligations of the Debtor set forth in sections 6.1 and 6.3 of Article VI of, and in Article IX of, the SLS APA."

notifiesfiles with the Bankruptcy Court, on notice to the Reorganized Debtor, the U.S. Trustee and all parties having requested notice in the Bankruptcy Case, a report that evaluates whether the Debtor's estate has no Debtor holds valuable actionsCauses of Actions or other rights against such Holder; it being provided that such report shall be filed no later than sixty (60) days after the Effective Date (such period from the Effective Date until the thirty (30) days after the Filing by the investigator of its report being referred to herein as the "**Investigation Period**").

THE FOREGOING RELEASE IN FAVOR OF ANY RELEASEE IS CONDITIONED UPON AND IN CONSIDERATION OF SUCH ENTITIES' WRITTEN AGREEMENT TO BE BOUND TO THE TERMS OF THIS PLAN, INCLUDING WITHOUT LIMITATION THEIR AGREEMENT TO COMPLY WITH THE PROVISIONS OF SECTIONS 5 AND 11.12 OF THIS PLAN, AND IN THE CASE OF THE DEBTOR'S PRINCIPALS THE MAKING OF THE CONTRIBUTION AND PASSAGE OF THE INVESTIGATION PERIOD, AND TO SUBJECT THEMSELVES TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR PURPOSES OF ENFORCEMENT OF THE TERMS OF THIS PLAN, AS SET FORTH IN THE ACKNOWLEDGEMENT AGREEMENT TO BE DELIVERED AS PART OF THE PLAN SUPPLEMENT.  For the avoidance of doubt, nothing herein constitutes or shall constitute a waiver, release, discharge or compromise by the Debtor, its Estate or the Reorganized Debtor with respect to the Aurora Litigation or the SLS Claims.

The Investigation Period will conclude prior to expiration of the period of time (the "Avoidance Action Limitation Period") allowed by Bankruptcy Code section 546(a) for actions under sections 544, 545, 547, 548 and 553 of the Bankruptcy Code.  In the event that the investigation discloses the existence of any right, claim or cause of action with an estimated (aggregate) value above $7,500 against the holders of the Debtor's Principals under sections 544, 545, 547, 548 and 553 of the Bankruptcy Code, the Reorganized Debtor shall file an adversary complaint in the bankruptcy court (which under the Plan will have retained jurisdiction of such Causes of Action) alleging such right(s), claim(s) or cause(s) of action seeking such recovery for the benefit of the Estate prior to expiration of the Avoidance Action Limitation Period.

2.    Releases by Holders of Claims of Their Claims against the Debtor, Debtor Principals, the Reorganized Debtor, other Holders of Claims or Interests.

The Plan Provides for the following Releases by Holders of Claims of Released Third Party Causes of Action:

**As of the Effective Date, for good and valuable consideration, and to the extent permitted under Delaware law, Holders of Claims and Interests that (i) hashave held, currently holdshold or may hold a Released Claim or any Released Third Party ClaimCause of Action (each as defined in the Planherein), (ii) is entitled to receive, directly or indirectly, a distribution in satisfaction of its Claim or Equity Interest pursuant to the Plan, and (iii) elects, by not checking or by checking the appropriate box on its Ballot or election form, as the case may be, to grant the releases set forth in section 11.10(b) of the Plan, on their own behalf and on behalf of anyone claiming through them, shall be deemed to have and hereby does conclusively, absolutely, unconditionally, irrevocably and forever release and discharge the Debtor, Debtor Principals, the Reorganized Debtor, other**

Holders of Claims or Interests (except such other Holders of Claims owing obligations under policies of insurance issued to the Debtor or the Estate) and the directors, officers, employees or advisors of the Debtor ~~as of the Petition Date and through the Effective Date~~ (the " (the "Third Party **Releasees"), from **Third Party Released Claims, which are defined in section 1.98 of the Plan to mean** any and all Claims, Interests, Causes of Action**, Litigation Rights** or Avoidance Actions that an Entity that opts in favor of the release set forth in section 11.10(b) ~~hereof~~**of the Plan** would have been legally entitled to assert (whether individually or collectively or directly, indirectly or derivatively, at law, in equity or otherwise), based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's restructuring, the conduct of the Debtor's business, the Chapter 11 Case, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Releasee and**/or Third Party Releasee and** the Debtor, the restructuring of Claims and Interests prior to or in the Chapter 11 Case, the negotiation, formulation or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of fraud, willful misconduct or gross negligence AND **other than the rights of the Debtor, the Reorganized Debtor or a Creditor Holding an Allowed Claim to enforce the obligations under the Plan and Avoidance Actions, Litigation Rights and Causes of Action preserved by the Plan, the Confirmation Order and the Plan (and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder**~~;~~**).** **provided**, **however**, that nothing in ~~this~~ Section 11.10(b) **of the Plan** shall be deemed to prohibit any party from asserting or enforcing any Direct Contractual Obligation against any Releasee **or Third Party Releasee**, with all rights and defenses to such claims **based on Direct Contractual Obligations** being reserved by the Releasees **or Third Party Releasee**; and **further**, **provided** **however**, that each person or entity that has elected not to grant the releases set forth in section 11.10**(b)** of the Plan shall not be entitled to, and shall not receive, any payment, distribution or other satisfaction of its claim pursuant to the Plan.

THE FOREGOING RELEASE IN FAVOR OF ANY RELEASEE IS CONDITIONED UPON AND IN CONSIDERATION OF SUCH ENTITIES' WRITTEN AGREEMENT TO BE BOUND TO THE TERMS OF THIS PLAN, INCLUDING WITHOUT LIMITATION THEIR AGREEMENT TO COMPLY WITH THE PROVISIONS OF SECTIONS 5 AND 11.12 OF THIS PLAN, AND IN THE CASE OF THE DEBTOR PRINCIPALS THE MAKING OF THE CONTRIBUTION, AND TO SUBJECT THEMSELVES TO THE JURISDICTION OF THE BANKRUPTCY COURT FOR PURPOSES OF ENFORCEMENT OF THE TERMS OF THIS PLAN, AS SET FORTH IN THE ACKNOWLEDGEMENT AGREEMENT TO BE DELIVERED AS PART OF THE PLAN SUPPLEMENT.  For the avoidance of doubt, nothing herein constitutes or shall constitute a waiver, release, or discharge by Aurora of the Debtor or compromise by Aurora of rights against the Debtor with respect to the Aurora Litigation.

~~11.~~**K.**   Release of Liens

Except as otherwise provided in the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds, trusts, Liens, pledges, or

other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds, trusts, Liens, pledges, or other security interests shall revert to the Reorganized Debtor.

12.L.   Discharge of Claims

In accordance with section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge Claims against and Interests in the Debtor; provided, however, that no Holder of a Claim against or Interest in the Debtor may, on account of such Claim or Interest, seek or receive any payment or other distribution from, or seek recourse against, the Debtor or their respective property or any assets previously distributed or to be distributed on account of any Allowed Claim except as provided herein.

13.M.   Injunction

**a)1.    Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim, Interest or other debt or liability that is discharged pursuant to Section 11.12 of the Plan, subject to an election to grant releases pursuant to Section 11.10 of the Plan, or is subject to exculpation pursuant to Section 11.14 of the Plan are permanently enjoined from taking any of the following actions against the Debtor, the Reorganized Debtor or their property on account of any such discharged, released or exculpated Claims, debts, or liabilities or any Released or terminated Interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding of any kind; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtor, the Reorganized Debtor or its property; (iii) creating, perfecting, or enforcing any Lien or encumbrance; (iv) asserting a right of setoff, recoupment or subrogation of any kind against any debt, liability, or obligation due to the Debtor or the Reorganized Debtor, unless such Holder has Filed a motion requesting the right to perform such setoff, subrogation, or recoupment on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff, subrogation, or recoupment pursuant to Bankruptcy Code section 553 or otherwise; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.**

**b)2.    Without limiting the effect of the foregoing provisions of Section 11.12 of the Plan upon any Person, by accepting Distributions pursuant to the Plan, each Holder of an Allowed Claim or Interest receiving a Distribution pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in this Section 11.12 of the Plan.**

**c)3.    Nothing in Section 11.12 of the Plan shall impair (i) the rights of any Holder of a Disputed Claim to establish its Claim in response to an objection Filed by the Debtor or the Reorganized Debtor, (ii) the rights of any defendant in an Avoidance Action Filed by the Debtor to assert defenses in such action, (iii) the rights of any party to an Executory Contract or Unexpired Lease that has been assumed by the Debtor pursuant to**

**an order of the Bankruptcy Court or the provisions of the Plan to enforce such assumed contract or lease; or (iv) or the rights of Aurora against the Debtor with respect to the Aurora Litigation**.

In connection with its analysis of the bankruptcy case and preparation of the Plan, the Debtor has reviewed and analyzed transactions between the Debtor and the Exculpated Parties occurring prior to the Petition Date and to the time of the Effective Date. The Debtor has concluded that it has no Causes of Action, Avoidance Actions or Litigation Rights against the Exculpated Parties. The releases, injunctions and exculpations under the Plan relating to the Debtor's Principals will, however, be subject to the Investigation Period, as defined by section 11.10 of the Plan.

N.    14.    Exculpation and Limitations of Liability under the Plan.

The Plan provides in section 11.14(a) that on the Effective Date, or in the case of the Holders of Old Class A Interests and Mr. Allon, upon the expiration of the Investigation Period, the Exculpated Parties shall neither have, nor incur any liability to any Holder of a Claim or an Interest, the Debtor, the Reorganized Debtor, or any other party-in-interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any post-petition act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, and further including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto, and all prepetition activities leading to the promulgation and confirmation of the Plan, except for acts or omissions that are the result of fraud, gross negligence, or willful misconduct; provided, however, that the foregoing is not intended to limit or otherwise impact any defense of qualified immunity that may be available under applicable law; provided further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan; provided still further, that the foregoing Exculpation shall not be deemed to, release, affect, or limit any of the rights and obligations of the Exculpated Parties from, or exculpate the Exculpated Parties with respect to, any of the Exculpated Parties' obligations or covenants arising pursuant to the Plan or the Confirmation Order.

In section 11.14(b), the Plan further provides that notwithstanding any other provision of the Plan, no Holder of a Claim or an Interest, the Debtor, the Reorganized Debtor, no other party-in-interest, none of their respective agents, employees, representatives, advisors, attorneys, or affiliates, and none of their respective successors or assigns shall have any right of action against any of the Exculpated Parties for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct

14.O.   Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code or otherwise, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

15.P.   Revocation, Withdrawal or Non-Consummation

The Debtor reserves the right to revoke or to withdraw the Plan at any time prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtor revokes or withdraws the Plan prior to the Confirmation Date, or if Confirmation or the Effective Date does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims against, or any Interests in, the Debtor, or any Avoidance Actions, Litigation Rights or other claims by or against the Debtor, or any Person or Entity, (ii) prejudice in any manner the rights of the Debtor, or any Person or Entity in any further proceedings involving the Debtor, or (iii) constitute an admission of any sort by the Debtor, or any other Person or Entity.

16.Q.   Plan Supplement

The Plan Supplement shall be filed with the Bankruptcy Court at least ten (10) days prior to the Confirmation Hearing or by such later date as may be established by order of the Bankruptcy Court, provided that all documents set forth in the Plan Supplement shall first have been approved by the Debtor.  Upon such Filing, all documents set forth in the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal business hours.  Holders of Claims or Interests may obtain a copy of any document set forth in the Plan Supplement upon written request to the Debtor in accordance with Section 11.22 of the Plan.

17.R.   Notices

Any notice, request, or demand required or permitted to be made or provided under the Plan shall be (a) in writing, (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission, and (c) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to the Debtor:

Hogan Lovells US LLP
Attn:   Peter A. Ivanick
         Lynn W. Holbert
875 Third Avenue

New York, NY  10022
Telephone:  (212) 918-3000

- and –

Bayard, P.A.
Attn:   Neil B. Glassman
          Justin R. Alberto
          Evan T. Miller
222 Delaware Avenue, Suite 900
Wilmington, Delaware  19801
Telephone:  (302) 655-5000

If to the Reorganized Debtor:

Allonhill, LLC
1200 17th Street
Suite 880
Denver, Colorado 80202
Telephone: (303) 303.308.6407

### 18.S.   Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Rule 9006(a) of the Bankruptcy Rules shall apply.

### 19.T.   Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of Delaware shall govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation of the Debtor shall govern corporate governance matters with respect to the Debtor; in each case without giving effect to the principles of conflicts of law thereof.

### 20.U.   Exhibits

All exhibits are incorporated into and are a part of the Plan as if set forth in full herein, and, to the extent not annexed hereto, such exhibits shall be Filed with the Bankruptcy Court on or before the Exhibit Filing Date.  After the Exhibit Filing Date, copies of exhibits can be obtained upon written request to Hogan Lovells US LLP, 875 Third Avenue, New York, NY 10022, Attn: Peter A. Ivanick, Esq. and Bayard, P.A., 222 Delaware Avenue, Suite 900, Wilmington, DE  19801, Attn: Neil B. Glassman, Esq., counsel to the Debtor or by downloading such exhibits from the Bankruptcy Court's website at http://www.deb.uscourts.govhttp://www.deb.uscourts.gov (registration required) or the Claims Agent's website, http://www.upshotservices.com/allonhill or by calling the Claims Agent at

(855) 812-6112.  To the extent any exhibit is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit portion of the Plan shall control.

## ARTICLE X

## VOTING ON AND CONFIRMATION OF THE PLAN

In order to confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of determinations concerning the Plan.  Specifically, the Bankruptcy Court must conclude that: (a) the Plan has classified Claims and Equity Interests in a permissible manner; (h) the Plan complies with all of the technical requirements of Chapter 11 of the Bankruptcy Code; (c) the Debtor has proposed the Plan in good faith; and (d) the Debtor's disclosures, as required by Chapter 11 of the Bankruptcy Code, have been adequate and include information concerning all payments made or promised by the Debtor in connection with the Plan.  The Debtor submits that all of these conditions will have been met by the Confirmation Date.

The Bankruptcy Code also requires that the Plan be accepted by the requisite votes of those entitled to vote on the Plan (except to the extent that "cramdown" is available under § 1129(b) of the Bankruptcy Code), that the Plan be feasible (that is, the confirmation of the Plan is not likely to be followed by the liquidation, or the need for further reorganization, of the Debtor), and that the Plan is in the "best interests" of all of the holders of Claims and Equity Interests (e.g. that that holders will receive at least as much under the Plan as they would receive in liquidation under Chapter 7 of the Bankruptcy Code).  To confirm the Plan, the Court must find that all of these conditions are satisfied.  Even if those entitled to vote accept the Plan by the requisite votes, the Bankruptcy Court must make independent findings as to the feasibility of the Plan and as to whether or not the Plan satisfies the "best interests" standard.  Each of these statutory conditions to confirmation is discussed below:

The Bankruptcy Code contains provisions for confirmation of a plan even if the Plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it.  Section 1129(b) of the Bankruptcy Code provides the standard for such a "cramdown." If all of the applicable requirements of Section 1129(a) of the Bankruptcy Code, other than subparagraph (8) thereof are found to have been met with respect to the Plan, the Debtor may then elect to seek confirmation pursuant to Section 1129(b) of the Bankruptcy Code, which is considered the "cramdown" section of the Bankruptcy Code.  For the purposes of seeking confirmation under the cramdown provision of the Bankruptcy Code, should that alternative means of confirmation be necessary, the Debtor reserves the right to modify the treatment given under the Plan to holders of Allowed Claims in one or more of the rejecting Classes.  See Article VI, Section F below for an explanation of how the Plan can be confirmed using the cramdown provisions of 1129(b) of the Bankruptcy Code.

A.    Best Interest Test

The Net Proceeds of the Debtor's Assets will be distributed under the Plan in accordance with the priority scheme set forth in the Bankruptcy Code.  Any Estate Assets not liquidated prior to confirmation of the Plan will be liquidated by the Reorganized Debtor.  The Debtor, therefore, believes that the Plan will achieve a much better distribution for all Creditors than they

would otherwise receive in a Chapter 7 and at a minimum, at least the same result if the case was to be converted to Chapter 7.  Under the Plan, however, the result can be achieved more affordably as it would not entail the duplication of administration costs which would result from the appointment of a Chapter 7 trustee and the appointment of additional professional persons who must learn the extensive facts and legal issues attendant to these proceedings.  In addition, the inordinate delay attendant to the administration of assets in most Chapter 7 cases coupled with the extensive learning curve of new professionals, when compared to the current knowledge of the Debtor, the corporate history, business relationships and financial condition all weigh in favor of liquidating under the Plan.

In addition, as previously stated, the Debtor has commenced an investigation into the transfers made to Stewart prior to the Petition Date.  The Debtor believes that viable breach of contract, fraudulent transfer and preferential transfer claims exist against Stewart.  The Creditors, therefore, are receiving, at a minimum, the equivalent of what they would receive if liquidation was accomplished in a Chapter 7, but realistically more when the strength of the litigation claims against Stewart are factored into this analysis.  It is the position of the Debtor, therefore, that Creditors would fare much better should the liquidation be achieved in Chapter 11 under the Plan, than in a Chapter 7 proceeding.

Finally, the Liquidation Analysis attached to the Disclosure Statement as Exhibit GF, reflects the Liquidation Value of the Debtor's Assets under a Chapter 7 scenario.  The Liquidation Analysis presumes that the amount available for each impaired Class of Creditors is derived from the aggregate dollar amount generated from the monetization of the Estate's Assets if the Chapter 11 casecases were converted to Chapter 7 and the Estate Assets were subsequently liquidated by the Chapter 7 trustee (the "Liquidation Value").  The Liquidation Value would consist of net Cash proceeds from the disposition of the Estates' Assets plus Cash held by the Debtor.  Thereafter, the Liquidation Value would be reduced by the amount of secured claims, the costs and expenses of the Chapter 7 liquidation and the other administrative expense claims and professional fee claims of the Debtor's Estates.

Once the percentage recovery in liquidation is determined for Secured Claims, Administrative Claims, Priority Unsecured Claims and General Unsecured Claims, the distributions available from the Liquidation Value of the Estate's Assets are compared to the value of the Property offered to each Class under the Plan.  This enables the Bankruptcy Court to determine whether the Plan satisfies the best interests test applicable to Creditors.  Based upon the Liquidation Analysis attached hereto as Exhibit GF, the Debtor believes that the Creditors are much better off in Chapter 11 receiving distributions under the Plan than they would be in a Chapter 7.

B.      Financial Feasibility

Under the Plan, the Debtor will not continue to operate during the post-confirmation period insofar as all of the Debtor's operating assets have been sold prior to confirmation of the Plan.  Therefore, it is highly unlikely for confirmation of the Plan to be followed by a subsequent liquidation proceeding or a second Chapter 11 case.  Nevertheless, the Debtor believes the Plan is feasible with respect to payments required to be made on the Effective Date insofar as there are sufficient funds and agreements in place to make distributions to Creditors entitled to same on the Effective Date.  Specifically, there is ample Cash available to satisfy all matured priority tax claims under 11 U.S.C. § 507(a)(8); and make distributions on Administrative Claims held by professionals.  Hence, to the extent required, the Plan is feasible.

C.      Classification of Claims and Equity Interests

The Bankruptcy Code requires that a plan place each creditor's claim and each equity interest in a class with other claims and equity interests that are "substantially similar."  For the rationale for the classification of Claims and Equity Interests used in the Plan, see Article IV.B., captioned "Classification of Claims."  The Debtor believes that the Plan meets the classification requirements of the Bankruptcy Code articulated in 11 U.S.C. § 1122.

D.      Voting

A.1.    Impaired Classes and Equity Security Interests

As a condition to confirmation, the Bankruptcy Code requires that each impaired class of claims or equity interests accepts the plan.  A class is "Impaired" if the legal, equitable or contractual rights attaching to the claims or equity interests of that class are modified, other than by curing defaults and reinstating the maturity dates thereof or by payment in full.  The Bankruptcy Code defines acceptance of an impaired class of claims as acceptance by holders of two-thirds in dollar amount and a majority in number of claims voting in that class.  For that purpose, the Bankruptcy Code counts only ballots that are timely submitted from entities that are entitled to vote on a plan.  Holders of Claims who fail to vote are not counted as either accepting or rejecting the plan.

B.2.    Classes That Are Not Impaired

Classes of claims that are not "impaired" under a plan are deemed to have accepted the plan.  There are only two unimpaired Classes under the Plan.  Classes 1 and 2, which include the Allowed Secured Claims and the Tax Claims, respectively, are unimpaired.

ARTICLE XI3.        Classes That Are Impaired  Impaired Classes Entitled to Vote.

Impaired Classes Entitled to Vote – Classes 3, 4 and 5 are Classes of claims or interests under the Plan that are deemed impaired because the holders of such Claims or Interests will not be paid in full on the Effective Date.  To the extent the holders of such Claims have Allowed Claims, even though impaired, they are entitled to vote to accept or reject the Plan.  Holders of Class 4 Interests, because they are insiders holding equity interests in the Debtor, will not be

entitled to vote to accept or to reject the Plan; rather, the Class will be deemed to accept the Plan and their ballots will be used to determine whether each such Holder consents to the releases, exculpations and injunctions granted by the Plan. Although Class 4 is deemed to accept the Plan, such acceptance shall not constitute acceptance by an impaired class for purposes of confirmation of the Plan under section 1129 of the Bankruptcy Code over the rejection of the Plan by another impaired class.

### B.E.    Confirmation With Acceptance by All Impaired Classes

The Bankruptcy Court requires as a condition to confirmation that each class of claims that is impaired under the plan accept the plan, with the exception described in the following section. A class of claims has accepted the plan if the plan has been accepted by creditors that hold at least two thirds in dollar amount and more than one half in number of the allowed claims or such class who actually vote to accept or reject the plan. The determination or acceptance is made without regard to the votes of insiders.

A class that is not "impaired" under the plan is deemed to have accepted the plan and therefore solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the: (1) legal, equitable and contractual rights to which the claim entitles the holder of such claim are not modified; or (2) with respect to a secured claim, the effect of any default is cured and the original terms of the obligations are reinstated.

### C.F.    Confirmation Without Acceptance by All Impaired Classes

The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted by all impaired classes, as long as at least one impaired class has accepted it. The "cramdown" provisions of the Bankruptcy Code are set forth in Section 1129(b). The Plan provides for utilization of the cram-down provisions under certain circumstances. See Article XIX of the Plan captioned "Provision to Invoke Cramdown."

A plan may be confirmed under Section 1129(b) if, in addition to satisfying the usual requirements of Section 1129(a) of the Bankruptcy Code, the plan: (i) "does not discriminate unfairly"; and (ii) is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan. The terms "discriminate unfairly" and "fair and equitable" are terms of art under the Bankruptcy Code and the decisional law construing it.

The requirement that a plan not "discriminate unfairly" means that a dissenting class be treated equally with other classes of equal rank The Debtor believes that the Plan does not "discriminate unfairly" and that no Classes are afforded treatment that is disproportionate to the treatment of other Classes of equal rank.

The "fair and equitable" standard, otherwise known as the "absolute priority rule," requires that a dissenting class receive full compensation in respect of its allowed claims, before any junior class receives a distribution. The Debtor believes that the Plan is fair and equitable as it does not violate the absolute priority rule. Under the Plan, no junior Classes of Claims or Equity Interests are retaining such Equity Claims and Equity Interests and receiving Distributions thereon unless all senior Classes are either paid in full or have consented to such

Distributions.  Holders of Equity Interests are having their Interests extinguished under the Plan and are receiving no distributions, except if all prior Classes of Claims and Interests have been paid in full.

> D.G.    Alternatives to the Plan

The Debtor believes that the Plan provides Creditors with the greatest possible value that could be realized on their Claims.  The primary alternative to confirmation of the Plan is liquidation of the Debtor under Chapter 7 of the Bankruptcy Code, in which event the Debtor believes that a Chapter 7 trustee may not achieve the same results for Creditors as those anticipated under the Plan.  Moreover, a Chapter 7 trustee would add an additional layer of administrative expense that would diminish the ultimate distribution available to holders of General Unsecured Claims.  For the foregoing reasons, the Debtor believes that the Distributions to each impaired Class under the Plan will be much greater than any distributions they could anticipate under a Chapter 7 liquidation.

> E.H.    Confirmation Hearing

The Bankruptcy Code requires that the Bankruptcy Court hold a hearing on the confirmation of the Plan after notice to Creditors.  This enables the Bankruptcy Court to consider whether the foregoing requirements have been met.  The Confirmation Hearing has been scheduled for November 24December 17, 2015 at 11:00 a.m. EST.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for the announcement of an adjourned hearing date in Bankruptcy Court at the Confirmation Hearing.

Any objection to confirmation must be made in writing, filed with the Bankruptcy Court and served upon the following so as to be actually received on or before 4:00 p.m. EST on November 17December 8, 2015 by the Clerk of the Bankruptcy Court and copies must be served on:

> (1)    Peter A. Ivanick, Esq.
> Lynn W. Holbert, Esq.
> Hogan Lovells US LLP
> 875 Third Avenue
> New York, NY 10022
> (212) 918-3000

> (2)    Neil Glassman, Esq.
> Evan Miller, Esq.
> Bayard, PA
> 222 Delaware Avenue
> Suite 900
> P.O. Box 25130
> Wilmington, DE 19899
> (302) 655-5000

(3)    Jane Leamy, Esq.
Office of the United States Trustee
844 N. King Street, #2207
Wilmington, DE 19801
(302) 573-6550

F.I.    Voting Instructions

A Ballot to be used for voting to accept or reject the Plan will be enclosed with all copies of this Disclosure Statement mailed to persons entitled to vote upon approval of the Disclosure Statement.  Each Creditor is entitled to vote, provided that: (a) its Claim has been scheduled by the Debtor and such Claim is not scheduled as disputed, contingent or unliquidated; (b) is not the subject of an objection; (c) has been temporarily allowed for voting purposes pursuant to Bankruptcy Rule 3018, or (d) is based on a timely filed proof of claim, unless its Claim is the subject of an objection or request for estimation made within twenty (20) days prior to the Voting Deadline or has been disallowed for voting purposes by the Bankruptcy Court.

Completed Ballots should be returned to:

Allonhill Ballot Processing Center
c/o Upshot Services LLC
7808 Cherry Creek South Dr., Suite 112
Denver, CO 80231

BALLOTS MUST BE RECEIVED ON OR BEFORE 4:00 P.M. ON NOVEMBER 13DECEMBER 8, 2015.  ANY BALLOTS RECEIVED AFTER THAT TIME AND DATE WILL NOT BE COUNTED.  ANY BALLOT WHICH IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO BE AN ACCEPTANCE.  ANY BALLOT THAT DOES NOT SPECIFY AN AMOUNT OR CLASS SHALL BE DEEMED TO BE A VOTE IN THE AMOUNT AND CLASS WHICH THE DEBTOR DEEM APPROPRIATE.

## ARTICLE XIIARTICLE XI

## MISCELLANEOUS DISCLOSURE

A.    Material Litigation

The Debtor's collective statements of financial affairs and schedules list all pending and threatened litigation of which the Debtor areis aware.  It is the position of the Debtor that there is no material risk of any adverse ruling in any pending or threatened litigation that would affect the Debtor's ability to consummate the Plan because the Plan is a "pot" plan with all Estate Assets, Litigation Rights, Causes of Action, Cash and Property of the Debtor to be distributed to Creditors in accordance with the priorities established by the Bankruptcy Code.  Although an adverse ruling in any litigation would dilute the "pot," it would not eliminate the 'pot' being

distributed to Creditors. The consideration for the releases provided for the Debtor, the Reorganized Debtor and their professionals is the preparation of the Plan for the exclusive benefit of all secured, priority unsecured and general unsecured creditors who are owed in excess of $30,000,000.  The Plan significantly enhances the distributions to General Unsecured Creditors through: 1) the revesting of Litigation Rights and Causes of Action in the Reorganized Debtor and; 2) the Reorganized Debtor's undertaking to pursue and to prosecute Causes of Action on behalf of and for the benefit of the Creditors, which would not occur in a Chapter 7; and 3) the Contribution, which also would not be made in a Chapter 7.

Creditors would undoubtedly be left with less possibility of recovery in a Chapter 7 liquidation of the Debtor.  Accordingly, the value created for this Class of Creditors under the Plan justifies the releases provided thereunder in favor of the Debtor, the Reorganized Debtor, the Debtor's Principals, Holders of Claims and their professionals.

B.      Certain Federal Income Tax Consequences

The following is a summary of certain U.S. federal income tax consequences of the Plan to the Debtor and Holders of Claims against and Interests in the Debtor. This summary is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations promulgated thereunder, and administrative and judicial interpretations and practice, all as in effect on the date hereof and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling from the Internal Revenue Service (the "IRS") as to any of such tax consequences, and there can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to Holders of Claims against and Interests in the Debtor that are not United States persons (as defined in the Code) or that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, and regulated investment companies). Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to the Debtor, and Holders of Claims against and Interests in the Debtor based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under state, local, or foreign tax law.

The following summary is not a substitute for careful tax planning and advice based on the particular circumstances of each Holder of Claims against and Interests in the Debtor. Each such Holder is urged to consult his, her, or its own tax advisor as to the federal income tax consequences, as well as any applicable state, local, and foreign consequences of the Plan.

     1.     1.    Certain U.S. Federal Income Tax Consequences to the Holders of Claims against and Interests in the Debtor

In general, Holders of Allowed Claims should recognize taxable gain or loss for U.S. federal income tax purposes to the extent that their Allowed Claims are surrendered in exchange for Cash, a promissory note, or any other distribution.  In such event, the amount of taxable gain or loss would be based upon the difference between the tax basis of such Allowed Claims and the amount of cash and fair market value of non-cash property received by such Holder. The tax basis of such Holder's Allowed Claim would equal the fair market value of such Claim at the time of the distribution, and the holding period for such new distributions, if any, would begin on the day following the exchange.

The U.S. federal income tax treatment of any taxable gain or loss recognized by a Holder regarding any Allowed Claims (as long-term or short-term capital gain or loss or as ordinary income or loss) will be determined by a number of factors, including (a) the U.S. tax status of the Holder, (b) whether the obligation from which the Allowed Claim arose constitutes a capital asset of the Holder, (c) whether the obligation from which the Allowed Claim arose has been held for more than one year or was purchased at a discount, and (d) whether and to what extent the Holder has previously claimed a bad debt deduction in respect of the obligation from which the Allowed Claim arose.

If the receipt by Class 4 Holders of New Common LLC Interests in the Reorganized Debtor is treated as though the Class 4 Holders engaged in a taxable exchange of their Old Class A Interests in the Debtor for New Common LLC Interests in the Reorganized Debtor, the U.S. federal income tax treatment of Class 4 Holders should be as described above.  In that case, such Holders will have a fair market value tax basis in the New Common LLC Interests in the Reorganized Debtor.  If the Class 4 Holders are instead treated as contributing their Old Class A Interests in the Debtor to the Reorganized Debtor in exchange for New Common LLC Interests in the Reorganized Debtor, such may be treated for U.S. federal income tax purposes as a tax-free contribution of property to a partnership in exchange for partnership interests. In that case, the Holders of Interests in the Debtor should not recognize gain or loss upon the contribution and each Holder should have a tax basis in the New Common LLC Interests in the Reorganized Debtor equal to its tax basis in the property contributed to the Reorganized Debtor (i.e., the Old Class A Interests in the Debtor).  Each Holder should have a holding period in the New LLC Interest of the Reorganized Debtor determined by reference to the holding period of the property contributed to the Reorganized Debtor (i.e., the Old Class A Interests in the Debtor).

     2.     2.    Certain U.S. Federal Income Tax Consequences to the Debtor and Holders of Interests in the Debtor

The outstanding indebtedness of the Debtor will be substantially reduced pursuant to the Plan. In general, for U.S. federal income tax purposes, a debtor recognizes cancellation of indebtedness ("COD") income upon satisfaction of its outstanding indebtedness for less than its adjusted issue price. The amount of COD income is, in general, the excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the sum of the issue price of any new indebtedness of the taxpayer issued, the amount of cash paid and the fair market value of any other consideration (including the stock of the taxpayer) given in satisfaction of indebtedness.

As the Debtor is treated as a partnership for U.S. federal income tax purposes, any COD income will not be subject to taxation in the hands of the Debtor but will instead be allocated proportionately to, and recognized by, the Holders of Interests in the Debtor.

Where a Debtor is an entity treated as a partnership for U.S. federal income tax purposes, the determination of excludability of COD income is made at the partner or member level. As the Debtor is treated as a partnership for U.S. federal income tax purposes, any COD Income will generally not be permitted to be excluded by a Holder of an Interest in the Debtor unless the Holder is insolvent or is under the jurisdiction of the federal bankruptcy court in the Chapter 11 proceeding pursuant to which the discharge of indebtedness occurs and the discharge of indebtedness is granted by such court or is pursuant to a plan approved by such court. In such cases, the Holder must reduce certain other tax attributes in an amount equal to the excluded COD income. In either event, the COD income passed through to the Holders will increase their bases in their partnership interests, as well as their capital account balances.

Payments to be made under the Plan should generally produce the following U.S. federal income tax effects and, if such payments would generally otherwise be deductible outside of a Chapter 11 proceeding, such payments should generally be deductible by Holders of an Interest in the Debtor to the extent described below:

-        -        Administrative expenses paid by the Debtor should be deductible by the Debtor, and these ordinary deductions should be passed through to the Holders of Interests in the Debtor;

-        -        Payment of the principal portion of secured claims generally should not be deductible by the Debtor, as it has already been included in the basis of the assets securing the debt or applied towards payment of previously deducted expenses.

-        -        Payment of interest attributable to secured claims should be deductible by the Debtor, to the extent such deductions have not already been accrued.

-        -        Payment of unsecured claims should be deductible by the Debtor to the extent a deduction for the subject payment has not already been accrued.

The Debtor should recognize income or loss on the sale of any assets sold in an amount equal to the difference between its amount realized on each sale and its adjusted basis or cost of goods sold in the subject asset(s) immediately prior to the transfer. The amount realized should include the amount of any nonrecourse indebtedness that is eliminated as a result of the sale.

All income recognized by the Debtor will be passed through to Holders of Interests in the Debtor in proportion to their Interests in the Debtor, and increase their capital account balances with respect thereto. Similarly, all potential deductions will be passed through to the Holders of Interests in the Debtor on a pro rata basis, and reduce the Holders' bases in their Interests and, therefore, their capital account balances. At this time, it is not possible to determine the amount of COD income, other income and deductible expenses which will be incurred prior to completion of the Plan.

### 3.    ~~3.~~    Information Reporting and Withholding

Payments in respect of Allowed Claims under the Plan may be subject to applicable information reporting and withholding, including possible backup withholding.  Withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan if the Holder of such Allowed Claim fails to provide an accurate taxpayer identification number or a fully completed and executed IRS Form W-9, or otherwise fails to comply with the applicable requirements of the withholding rules, including backup withholding rules. Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided*, *however*, that the required information is timely provided to the IRS.

The Debtor will withhold all amounts required by law to be withheld from payments of interest. The Debtor will comply with all applicable reporting requirements of the Code.

### 4.    ~~4.~~    Certain U.S. Federal Income Tax Consequences to the Reorganized Debtor

The Reorganized Debtor should be classified and treated as a partnership, and not as an association taxable as a corporation, for U.S. federal income tax purposes, unless it makes an election or takes any position to the contrary which is not currently intended.  As a result of being treated as a partnership for U.S. federal income tax purposes, the Reorganized Debtor will not pay U.S. federal income taxes, but each partner or member of the Reorganized Debtor will be required to report its distributive share (whether or not distributed) of the income, gains, losses, deductions, and credits of the Reorganized Debtor. It is possible that the partners or members of the Reorganized Debtor could incur income tax liabilities without receiving from the Reorganized Debtor sufficient distributions to pay such tax liabilities.

### C.      Special Risk Factors

Certain substantial risk factors are inherent in most plans of reorganization or liquidation in Chapter 11 ~~case~~cases if such plans are accepted, it is usually because they represent a greater return in dividends than in a Chapter 7 liquidation scenario.

### ~~ARTICLE XIII~~ARTICLE XII

### **CONCLUSION**

The Debtor believes that the Plan meets all of the requirements for confirmation under the Bankruptcy Code.  The Debtor further believes the Plan is in the best interests of all Classes of Creditors and Equity Interest Holders.  There is no existing alternative to the Plan that would afford better treatment to secured, priority unsecured, or general unsecured creditors than the treatment provided in the Plan.  Creditors who wish to ensure that the Plan will be confirmed should exercise their right to vote in favor of the Plan and all Claimants are urged to do so.

Dated: ~~October 21~~November 2, 2015

| | |
|---|---|
| Peter A. Ivanick | BAYARD, P.A. |
| Lynn W. Holbert | */s/ Neil B. Glassman* |
| Hogan Lovells US LLP | Neil B. Glassman (No. 2087) |
| 875 Third Avenue | Justin R. Alberto (No. 5126) |
| New York, NY  10022 | Evan T. Miller (No. 5364) |
| Telephone:  (212) 918-3000 | ~~BAYARD, P.A.~~ |
| | 222 Delaware Avenue, Suite 900 |
| | Wilmington, Delaware  19801 |
| | Telephone:  (302) 655-5000 |
| | |
| | *Counsel for the Debtor and Debtor-in-Possession* |